[L.A. No. 31799. Apr. 3, 1986.]

PERCY BALLARD, Plaintiff and Appellant, v.
FRANK URIBE, Defendant and Appellant.

COUNSEL

Jeffrey B. Harrison and Gerald H. B. Kane, Jr., for Plaintiff and Appellant.

Joseph Ryan, Jr., and Lana Feldman for Defendant and Appellant.

OPINION

**GRODIN, J.**—In this personal injury case, which was bifurcated to permit separate determinations of liability and damages, the jury found defendant liable and rendered a verdict in favor of plaintiff for $200,000. Defendant seeks to overturn the finding of liability on the basis of instructional error. Plaintiff, by cross-appeal, seeks to overturn the damages verdict on the basis of instructional error and juror misconduct. We find no error requiring reversal, and therefore affirm.

## I.

Plaintiff was injured in December 1975 while using an "aerial manlift" owned by defendant. At the time of the injury, plaintiff was employed by Guy F. Atkinson Company (Atkinson), a general contractor engaged in the construction of a freeway interchange. Several months before the injury, defendant had been hired by Atkinson as a subcontractor to perform concrete work on the project and defendant brought the lift to the construction site to use in his work.

The lift, which rested on a truck bed, consisted of a basket mounted on an extension or boom ladder; the basket had three sides but was open at the back to permit entry and exit. A stabilizing cable was connected to the ladder to keep the basket level as the ladder was raised or lowered.

In late November or early December 1975, defendant noticed that the stabilizing cable was frayed and broken. Since defendant intended to be away from the construction site for several weeks and did not plan on using the lift over that period of time, he asked Atkinson's project manager, Peter Boli, for permission to leave the lift in Atkinson's fenced equipment yard for a few weeks until defendant's mechanic could repair it.

Although all parties agreed that Boli gave defendant permission to leave the lift in Atkinson's yard, there was some dispute as to an additional discussion between the two men. Boli testified that because he believed that Atkinson workers might have some use for the lift in their own work on the project, he asked defendant if Atkinson could borrow or rent the lift. When defendant informed Boli that some sort of cable on the lift was broken, Boli offered to have Atkinson's master mechanic make whatever repairs were necessary. Boli testified that defendant agreed that Atkinson could use the lift after repairing it.

Defendant gave conflicting accounts of these events. At his deposition and at one point in his trial testimony, defendant stated that he had never given Boli permission to use the lift; at other points in his testimony, however, he admitted that he may have told Boli that Atkinson could use the machine but only after it was repaired.

Defendant acknowledged that his usual practice was to remove the keys to both the truck engine and the lift engine before leaving the lift at a job site, as a precaution against unauthorized use of the equipment by others. There was also evidence that it was customary in the construction industry—in dealing with defective equipment—to remove the equipment's keys, to lock existing control boxes and to use warning tags to protect against unauthorized use. When defendant parked the lift in Atkinson's yard, however, he left the keys to both engines in the truck and did not lock the control box or post any warning signs.

Boli testified that on the day defendant left the lift in Atkinson's yard, he asked William McAnally, Atkinson's master mechanic, to inspect the lift and make necessary repairs. After examining the lift, McAnally removed the broken stabilizing cable and ordered a replacement cable.

On December 11, 1975, plaintiff was sandblasting a bridge column with another Atkinson employee, Bruce Duren. The equipment they were using

would not lift them high enough to finish the job, and a supervisor, Ramon Lopez, told them to use defendant's lift. Plaintiff and Duren began using the lift, unaware that its stabilizing cable had broken and had been removed.

After plaintiff entered the basket, Duren, operating the ladder controls from the truckbed, raised the basket into position next to the bridge column. When Duren attempted to move the basket away from the column, the basket began to rise and flipped backwards; plaintiff was tossed out, falling approximately 35 feet to the ground. He suffered serious injuries as a result of the fall.[1]

Plaintiff thereafter instituted this action against defendant, claiming he had taken inadequate precautions to prevent injuries from the foreseeable use of his lift. As noted above, the issues of liability and damages were bifurcated. After an initial jury found in favor of plaintiff on the question of liability, a second jury set plaintiff's damages at $200,000. Both parties appeal from the judgment.

## II.

Defendant contends that the trial court erred in instructing the jury on the applicable principles of liability. The trial court initially gave the jury a modified BAJI instruction with regard to the duty of care that must be exercised by a bailor of property.[2] At plaintiff's request, and over defendant's objection, the court additionally gave an instruction—"special instruction number 5"—which informed the jury that if an owner of a vehicle knows or should have known "of special circumstances which create a reasonable risk of harm from the use or operation of a vehicle, if the keys are left in the vehicle," then the owner has a duty to use reasonable care to

---

[1] After the accident, defendant inspected the lift and discovered that someone had "tied down" the basket with chains and wire. Lopez testified that McAnally had attached the chains and wire to compensate for the missing stabilizing cable, but McAnally denied that claim, stating that he had simply removed the broken cable.

[2] The bailment instruction read as follows: "When one gives possession and the right to use personal property to another and the latter agrees to return the same property to him at a future time, the transaction is known in law as a bailment. The person who gives possession is known as a bailor. The person who takes possession is known as a bailee. When the bailment is for the benefit of both parties or for the sole benefit of the bailor, the bailor has a duty to those whom he should expect to use the property, or be endangered by its probable use, to use reasonable care to make it safe for use in a manner for which, and by a person for whose use, it is bailed, or to disclose its actual condition to those who may be expected to use it. A failure to fulfill that duty is negligence."

protect third persons from harm arising from such conduct.[3] The principal issue presented by this case is whether the giving of this latter instruction constituted prejudicial error.

Defendant initially contends that on the facts of this case the bailment instruction fully covered all aspects of defendant's liability and that no additional instruction should have been given at all. The bailment instruction (see fn. 2, *ante*), however, defined bailment to include only situations in which "one gives possession *and the right to use* personal property to another." (Italics added.) Although much of the evidence did suggest that defendant had authorized Atkinson to use the lift if Atkinson first made the necessary repairs, the record also contains statements by defendant—largely, but not completely, recanted at trial—to the effect that he had never authorized Atkinson to fix or use the lift. In light of that evidence, plaintiff was entitled to have the jury instructed on the general principles that would apply if it found that defendant had not authorized the use of its lift. Plaintiff's special instruction No. 5 was intended to address that situation, and plaintiff's counsel, in closing argument, explained to the jury that the principles of the special instruction were to be applied if it found that defendant had not authorized the lift's use.[4]

---

[3]Plaintiff's special instruction No. 5 read as follows: "The duty of the owner of a vehicle is to use due care in the operation and control of the vehicle. In the absence of special circumstances an owner of a vehicle has no duty to control the conduct of third persons resulting from the keys having been left in the vehicle. [¶] However, where the owner knew or should have known of special circumstances which create a reasonably foreseeable risk of harm from the use or operation of the vehicle, if the keys are left in the vehicle, then the owner of the vehicle has a duty to use reasonable care to protect the general public from such risks. [¶] Evaluation of the evidence to determine if special circumstances exist should include a consideration of the foreseeability of the chance of someone intermeddling with the vehicle, as well as the magnitude of potential harm or injury from use of the vehicle. You may take into consideration the type of vehicle, the location where the vehicle was left, the condition of the vehicle, and all other factors which are established by the evidence. [¶] If from your consideration of the evidence you find that the owner of the vehicle knew or should have known of the existence of special circumstances which created a reasonably foreseeable risk of harm or injury from the potential use of the vehicle, then you shall find that the owner had a duty to use due care to protect third persons from harm arising from its operation. [¶] The failure to fulfill such duty is negligence."

[4]In beginning his discussion of special instruction No. 5, plaintiff's counsel told the jury: "I want to go to an issue that— . . . let's assume you believe it was an unauthorized use as Mr. Uribe says—that nobody ever asked me to use it. Nobody. [¶] I never gave permission . . . I have to take ten minutes to cover this subject so you understand I'm taking two theories. [¶] . . . [B]ranch one of that river is a bailment. And we just kind of discussed that duty there. [¶] Branch two is no permission. [¶] What if Atkinson took it without permission and if you believe that. Let me cover the law on it briefly and also go into it factually."

At the conclusion of his discussion of this point, he repeated: "We have gone through the foreseeability issues because you approach this issue if you get to it, if you get to the unauthorized use, you have to back through that issue of negligence."

■ Defendant next contends that even if the plaintiff was entitled to some instruction applicable outside of the authorization-of-use context, the trial court erred in framing the instruction in terms of the "special circumstances" doctrine embodied in a line of decisions emanating from *Richardson* v. *Ham* (1955) 44 Cal.2d 772 [285 P.2d 269] and *Hergenrether* v. *East* (1964) 61 Cal.2d 440 [39 Cal.Rptr. 4, 393 P.2d 164].[5]

Defendant contends that *Richardson* and *Hergenrether* establish an analysis to guide *courts* in determining when a *duty* arises on the part of a vehicle owner to protect third parties from the unauthorized use of the vehicle by another, and that the trial court erred in leaving the question of duty—a question which is generally for the court—to the jury.

■■■■ ■■■ ■ Although defendant is correct in suggesting that the trial court should properly have resolved the duty issue itself,[6] defendant could not have been prejudiced by the instruction in this

---

[5]The *Richardson* and *Hergenrether* cases recognized exceptions to the rule embodied in this court's earlier decision in *Richards* v. *Stanley* (1954) 43 Cal.2d 60 [271 P.2d 23]. In *Richards,* the court held that the owner or bailee of an ordinary motor vehicle who leaves the keys in the ignition of the car when parked on a public street does not owe a duty of care to a person injured by a thief's negligent operation of the vehicle. (*Id.,* at p. 66.) In *Richardson* and *Hergenrether,* each of which involved a factual situation substantially different from *Richards,* our court concluded that the owner of a vehicle could be held liable for injuries resulting from the unauthorized use of the vehicle where "special circumstances" were present. (See generally *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 183-186 [203 Cal.Rptr. 626, 681 P.2d 893]; *Enders* v. *Apcoa, Inc.* (1976) 55 Cal.App.3d 897, 901-904 [127 Cal.Rptr. 751].) Because this case clearly falls within the "special circumstances" exception, we have no occasion to consider the continued vitality of *Richards.* (See *Palma* v. *U.S. Industrial Fasteners, Inc., supra,* 36 Cal.3d 171, 186, fn. 13.)

[6]Some confusion has arisen over the respective roles played by the court and the jury in determining liability in the *Richards* v. *Stanley, Richardson,* and *Hergenrether* context. The confusion may stem, at least in part, from the fact that the "foreseeability" concept plays a variety of roles in tort doctrine generally; in some contexts it is a question of fact for the jury, whereas in other contexts it is part of the calculus to which a court looks in defining the boundaries of "duty."

The question of "duty" is decided by the court, not the jury. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 493, p. 2756 and cases cited; Prosser & Keeton on Torts (5th ed. 1984) p. 236.) As this court has explained, "duty" is not an immutable fact of nature " 'but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] [quoting Prosser, Law of Torts, (3d ed. 1964) pp. 332-333].) In California, the general rule is that all persons have a duty " 'to use ordinary care to prevent others being injured as the result of their conduct. . . .' " (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561] (citations omitted); Civ. Code, § 1714.) *Rowland* enumerates a number of considerations, however, that have been taken into account by courts in various contexts to determine whether a departure from the general rule is appropriate: "the major [considerations] are *the foreseeability of harm to the plaintiff,* the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of

case, because it is clear under past authorities that here defendant did bear a duty to use due care even if he had not authorized Atkinson or its employees to use his machinery. ■■■ The *Richardson* decision itself—the first case to apply the "special circumstances" exception in recognizing duty—establishes that the significant danger posed by the unauthorized use of heavy construction machinery warrants recognition of a duty on the part of machinery owners to use due care to prevent the injurious misuse of the machinery by others. The *Richardson* court concluded that in light of the dangers involved, the imposition of liability on the machinery owner for negligence in controlling unauthorized use might have a salutary effect on public safety and would not impose an undue burden on the machinery owner. That conclusion is as applicable to the owner of an aerial manlift as it was to the owner of the bulldozer involved in *Richardson*.

Defendant maintains, however, that because the machinery in this case was left in a fenced-in area in the possession of Atkinson, rather than in an unenclosed, unguarded location as in *Richardson, Richardson* does not support the imposition of a duty of care. Although the location in which defendant left his machinery, as well as the other steps which defendant may have taken to minimize the danger of injury—for example, notifying Atkinson's foreman and other supervisory employees of the lift's dangerous condition—could well have been found by the jury to render defendant nonnegligent in controlling his machinery, those factors, in themselves, did not negate defendant's general duty—as the owner of a piece of heavy construction machinery—to use due care to prevent injurious misuse. That general duty applies wherever the machinery may be found.

■■■ Finally, defendant contends that if the jury found that he had not authorized Atkinson to use the lift—the premise on which special instruction No. 5 was based—the evidence was insufficient to support a finding that he was negligent in controlling the machinery; he therefore argues that the trial court should not have left this issue to the jury. But if the jury concluded

---

preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (Italics added.) (69 Cal.2d at p. 113.) The foreseeability of a particular kind of harm plays a very significant role in this calculus (see *Dillon* v. *Legg, supra,* 68 Cal.2d 728, 739), but a court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

The jury, by contrast, considers "foreseeability" in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.

that defendant had not authorized Atkinson's use of the lift under any circumstances, it may have concluded that defendant did not act with due care in leaving the keys to the defective lift with the machinery where it could be used by unknowing employees or in failing to attach warning tags to the vehicle. Although the jury was not compelled to find that defendant's conduct with respect to the lift was negligent, the trial court acted properly in leaving the issue of negligence to the jury.

Accordingly, the giving of special instruction No. 5 does not warrant reversal of the judgment in favor of plaintiff.

## III.

■ As noted, plaintiff has also appealed from the judgment. After the jury returned its verdict awarding plaintiff $200,000, plaintiff moved for a new trial or additur, claiming that misconduct on the part of two jurors had resulted in an inadequate damage award, and claiming also that the trial court erroneously instructed the jury that it could not consider as an element of plaintiff's damages the medical expenses paid by Atkinson's workers' compensation insurance carrier. In support of his misconduct claim, plaintiff filed declarations of four jurors, reporting that two other jurors had made a number of statements during jury deliberations which plaintiffs contended amount to misconduct and evidence of concealed bias. The trial court rejected plaintiff's objection and refused to grant a new trial or order an additur.

Although plaintiff challenges the court's ruling on appeal, he has not provided an adequate record to permit us to determine whether reversal of the judgment on either ground is appropriate. The record on appeal does not contain a transcript of the hearing of the new trial motion; thus, we do not know the basis of the trial court's denial. Nor does the record contain a transcript of the voir dire proceeding; thus, we cannot evaluate the significance of the statements attributed to the jurors against the claim of concealed bias. Finally, and most significantly, plaintiff has failed to include either a transcript or a settled statement of the portion of the trial relating to the issue of damages. In the absence of such a record, we have no way of ascertaining whether it is reasonably probable that either the alleged juror misconduct or the instructional error affected the damages awarded in this case.

It is well settled, of course, that a party challenging a judgment has the burden of showing reversible error by an adequate record. (See, e.g., *Cosenza* v. *Kramer* (1984) 152 Cal.App.3d 1100, 1102 [200 Cal.Rptr. 18]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 418, pp. 415-416 and cases

cited.) Because plaintiff has failed to provide such a record, we have no occasion to consider further the merits of his cross-appeal.

The judgment is affirmed.

Broussard, J., and Reynoso, J., concurred.

MOSK, J.— ( I concur generally in the majority opinion. However, I would not be as equivocal as the majority in its treatment of the effort to impeach the jury verdict. The plaintiff's challenge should not be rejected merely because of an inadequate record: it should be forthrightly rebuffed on principle.

I must express my apprehension at an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. Giving such appeals and petitions any credence prevents the finality of judgments, places additional burdens on the judicial process, and contributes to disenchantment with the tort system.

Most juror affidavits, demonstrably so in this case,[1] delve into the subjective concerns of the jurors during their deliberations. When deference is given to such affidavits, encouragement is given to opposing counsel in future cases to engage in postverdict competition to obtain juror affidavits revealing discussions that took place behind the closed doors of the deliberation room. Generally the party with the most resources will win that contest. If affidavits purportedly relating jury discussions are permissible, in the interest of accuracy we may as well install recording devices in jury rooms.

In most cases it is not difficult for counsel to persuade a juror to sign a law-office-prepared affidavit. Human nature being what it is, dissenting jurors in a case that ended in a nine-to-three verdict may be eager to upset a result to which they were stubbornly opposed. (Cf. *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 108 [95 Cal.Rptr. 516, 485 P.2d 1132].) And even some assenting jurors who were not firmly committed to their vote but were persuaded by the majority may wish to assuage a feeling of remorse, or merely desire to placate a disappointed losing litigant.

Justice is not served by tiresome replays of jury deliberations. I would adhere strictly to the basic rule, but not necessarily all the dicta, of *People*

---

[1]The affidavits purported to relate discussions during jury deliberations on the subject of damages for pain and suffering and loss of consortium.

v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], in which Chief Justice Traynor declared (at p. 351): "We therefore hold that jurors are competent witnesses to prove *objective facts* to impeach a verdict under section 1150 of the Evidence Code." (Italics added.) The objective fact in that case was the intrusion of the bailiff into jury deliberations; it takes little analysis to establish the impropriety of that conduct.

Similarly, in *People* v. *Valles* (1979) 24 Cal.3d 121 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116], an alternate juror was permitted to sit in with the 12 deliberating jurors—again an objective fact. In *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050], the jury foreman contacted an outside attorney for advice on the law—an objective fact. In *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 410 [185 Cal.Rptr. 654, 650 P.2d 1171], it was asserted that a juror was reading a novel during the taking of testimony—an objective fact. In *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 959 [182 Cal.Rptr. 176], a juror separated himself from the others, sat in an anteroom and did not participate in discussions—an objective fact. In *Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356, 363 [97 Cal.Rptr. 589], a malpractice case, a juror did not reveal the objective fact that he was a dentist.

*In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260], is consistent with my views. Instruction on the law by the offending juror in that case amounted to an overt usurpation of the function of the court, and plainly constituted "as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*Id.* at p. 398.)

On the other hand, the views expressed by individual jurors on the nature and extent of injuries, compensation for loss of consortium, and value of pain and suffering, are necessarily subjective. There is no dictionary or medical definition of the value in dollars and cents of pain and suffering. Inevitably the background and experience of the jurors will influence their reduction to figures of that which is not precisely evaluated by the presentation of the parties or the instructions of the trial judge.

The affidavits at issue in this case do not require a finding of jury misconduct. There is nothing related in these affidavits that does not occur in countless jury trials every day. It is inevitable that during deliberations tempers will flare and loose remarks or hyperbole will be uttered. I am confident it is not uncommon for a juror or jurors to express ill-considered disagreement with the law recited by the judge. (Osterman, *Law Must Re-*

*spect Consciences* (1986) 72 A.B.A. J. 36.) Indeed, Justice Kaus, in his separate opinion in *People* v. *Dillon* (1983) 34 Cal.3d 441, 491 [194 Cal.Rptr. 390, 668 P.2d 697], argued for recognition of what he described as the "power of a jury to nullify what it considers an unjust law." *Dillon* was a dramatic example of jurors beseeching the court for the right to disregard the strict mandate of the instructions. We ultimately agreed with the jurors on the facts of that case.

Those who seek to probe into the deliberations and subjective beliefs of jurors fail to fully appreciate the history and role of the jury in Anglo-American jurisprudence. As Justice Holmes reminded us, juries were originally "an inquest of the neighbors most likely to know about a disputed matter of fact. They spoke from their own knowledge . . . ." (Holmes, The Common Law (1963) p. 207.) Lord Coke described jurors as chancellors. In modern times we expect juries to know none of the facts prior to trial and to receive instruction on the law from the judge, but as an experienced trial judge has pointed out, "Traditionally juries are the device by which the rigor of the law is modified . . . ." (Judge Charles E. Wyzanski, Jr., Whereas: A Judge's Premises (1965) p. 12.) A learned commentator has expressed "esteem for the kind of folk wisdom which juries are supposed to represent." (John P. Frank, Justice Daniel Dissenting (1963) p. 292.)

A jury has also been frequently described as "the conscience of the community." (*United States* v. *Spock* (1st Cir. 1969) 416 F.2d 165, 182.) In addition, courts have long recognized that "in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation" (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 266 [148 Cal.Rptr. 890, 583 P.2d 748]). The very purpose of the right to trial by a jury drawn from a representative cross-section of the community "is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences." (*Id.*, at p. 276.)

It would be a grave disservice to the integrity of the jury system and to the finality of judgments if we were to encourage probing into the subjective reasons behind the unanimous verdict in the case at bar. The affidavits were filed in connection with the motion for a new trial on damages because counsel erroneously believed a reviewing court can properly probe into jury discussions and in that manner ascertain the subjective concerns of jurors. Under that theory juries will be confined to the straitjacket of judges' often arcane instructions, unable ever to modify "the rigor of the law" or express the "folk wisdom" and "conscience of the community." What is worse,

traditional jury secrecy will be at an end. Such a result would be regressive and counterproductive to the orderly and effective administration of justice.

**LUCAS, J.**—Although I continue to believe that *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260], was incorrectly decided (see *id.*, at p. 403 [dis. opn.]), in all other respects I concur with the concurring opinion of Justice Mosk. No jury misconduct occurred in this case.

**BIRD, C. J.**, Concurring and Dissenting.— Does the owner of a motor vehicle, who leaves the vehicle in operable but dangerous condition in a place where its use by a person unaware of the danger is foreseeable, have a duty to protect that person against the risk of injury?

### I.

In 1975, plaintiff was employed by Guy F. Atkinson Company (Atkinson), a general contractor on a freeway interchange construction project.[1] Defendant was hired as Atkinson's subcontractor in October or November of 1975 to perform concrete repair and finishing work on the project.

Defendant owned a truck-mounted "aerial manlift" which he used in his work on the project. The manlift was designed to raise a worker into position to perform tasks high above the ground. It consisted of a basket mounted on the end of a boom ladder. The basket was enclosed on three sides, but open at the back to permit the worker to enter and exit. The ladder could be raised, extended, and moved from side to side by use of controls located both in the basket and on the truckbed. The manlift had two engines, one to move the ladder and the other to move the truck on which the ladder was mounted. A separate key was required to operate each engine.

A cable on the ladder kept the basket upright and level as the ladder was raised and lowered. Without the stabilizing cable, the basket could tip over and eject the worker who was standing inside.

In late November or early December of 1975, as defendant neared completion of one phase of his work on the project, he noticed that the basket's stabilizing cable was frayed and broken. Defendant planned to be away for

---

[1]On this appeal from a judgment for plaintiff, conflicts in the evidence must be resolved in plaintiff's favor. "[T]he court must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236, italics omitted; see, e.g., *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) This rule has been applied in the summary of facts set forth in the text. Conflicts in the evidence are noted only where necessary to the discussion.

the next few weeks, working on another project. Since he did not intend to use the manlift during that period, he asked Peter Boli, Atkinson's project manager, for permission to leave it in Atkinson's fenced equipment yard for two or three weeks until defendant's mechanic could repair it. Boli agreed.

Boli thought that Atkinson personnel might have use for the manlift in their work on the project. He asked defendant if Atkinson could rent or borrow it. Defendant told Boli that some sort of cable was broken, but he did not tell Boli that it was the basket stabilizer cable or that the manlift could not safely be used unless the cable was repaired.[2]

Boli offered to have Atkinson's master mechanic make whatever repairs were necessary. The evidence is conflicting regarding defendant's response to this offer. Defendant himself gave two different accounts, testifying at times that he continued to refuse permission to use the manlift and at other times that he acceded on condition that Boli have it repaired. Boli testified that defendant agreed that Atkinson could use the machine after repairing it.

Whether a rental agreement was entered was also the subject of conflicting testimony. Ramon Lopez, Atkinson's labor superintendant, testified that he discussed rental of the manlift with defendant about two weeks before plaintiff's accident, and that they tentatively agreed on specific terms including price. Boli also testified that he believed defendant was interested in renting. However, he did not recall discussing specific terms with defendant. Instead, Boli referred the matter to Atkinson's business manager to prepare a rental agreement. A week or two after defendant left the manlift in the equipment yard, he received a draft rental agreement in the mail from Atkinson but did not sign it. Atkinson never paid defendant for the use of the machine.

Defendant's usual practice was to remove the keys before leaving the manlift at a job site, as a safety precaution against its unauthorized use by others. He knew that workers with access to the yard were interested in using the manlift. Construction industry custom in the handling of defective equipment required removal of keys, locking of control boxes and use of warning tags to protect against harm from unauthorized use. Nevertheless, when defendant parked the manlift in the Atkinson equipment yard, he left the keys to both engines in the truck. He failed to lock the control box or place a warning tag on the vehicle to warn of its dangerous condition.

---

[2]Defendant disputed Boli's testimony on this point. He testified that he told Boli specifically that the stabilizer cable was broken and that, as a result, the manlift was dangerous to use.

On the day defendant left the manlift in the equipment yard, Boli asked William McAnally, Atkinson's master mechanic, to inspect the manlift and prepare it for use. McAnally removed the broken basket stabilizer cable and ordered a replacement. McAnally knew that the cable provided the only stabilization for the basket and that without it the manlift was unsafe.

On December 11, 1975, plaintiff and another Atkinson employee, Bruce Duren, were sandblasting a bridge column. Because the equipment they were using would not lift plaintiff high enough to complete the job, Lopez told plaintiff and Duren to use defendant's manlift. The stabilizer cable had not been replaced. Plaintiff was unaware of that fact and was also unaware that the cable had ever been broken or removed.

Plaintiff entered the basket and was raised into position next to the bridge column by Duren, who operated the ladder controls on the bed of the truck. Plaintiff signalled Duren to move the basket back from the column. Instead, it began to rise. As it did so, the basket flipped backwards so that it was perpendicular to the ground. Plaintiff was ejected through the opening in the rear of the basket. He fell approximately 35 feet, striking a tool box on the truckbed and bouncing from there to the ground. Plaintiff suffered various injuries as a result of his fall.

Defendant inspected the manlift after the accident and discovered that someone had "tied down" the basket with chains and wires.[3]

Trial of plaintiff's action for damages was bifurcated. (Code Civ. Proc., § 598.) The issues of liability and damages were tried separately before different juries. At the close of evidence in the first trial, the liability issue was submitted to the jury on a theory of negligence. The jury returned a general verdict in favor of plaintiff. In the second trial, the jury awarded plaintiff $200,000 in damages. A single judgment was entered on the two verdicts.

Defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial. Plaintiff moved for a new trial or in the alternative for an order of additur. The trial court denied these motions. Both parties appeal from the judgment.

## II.

The jury in the liability phase of the trial was given a modified version of BAJI No. 9.27, sixth edition 1977, regarding the duty of a bailor for

---

[3]According to Lopez, McAnally had attached the chains and wires prior to plaintiff's accident in an attempt to compensate for the missing stabilizer cable. McAnally denied having done anything to the manlift other than removing the broken cable.

hire.[4] At plaintiff's request and over the objection of defendant, the court also instructed the jury that the owner of a vehicle who negligently leaves the keys in the vehicle has a duty to protect the general public against harm from use of the vehicle if the owner knows or should know of "special circumstances" that make the risk of such harm reasonably foreseeable.[5] The primary issue this court must resolve is whether this instruction was properly given.

In *Richards* v. *Stanley* (1954) 43 Cal.2d 60 [271 P.2d 23] (hereafter *Richards*), this court held that the owner or bailee of a vehicle who leaves the keys in the ignition does not owe a duty of care to a person injured by a thief's negligent operation of the vehicle. (*Id.*, at p. 66.) Subsequent cases recognized an exception to that general rule where "special circumstances" are shown. (See, e.g., *Richardson* v. *Ham* (1955) 44 Cal.2d 772 [285 P.2d 269]; *Hergenrether* v. *East* (1964) 61 Cal.2d 440 [39 Cal.Rptr. 4, 393 P.2d 164]; *Enders* v. *Apcoa, Inc.* (1976) 55 Cal.App.3d 897 [127 Cal.Rptr. 751].)

Defendant contends that the trial court erred by giving the special circumstances instruction, since the manlift was used by a bailee (Atkinson) rather than by a thief. According to defendant, the special circumstances instruc-

---

[4]The jury was instructed as follows: "When one gives possession and the right to use personal property to another and the latter agrees to return the same property to him at a future time, the transaction is known in law as a bailment. The person who gives possession is known as a bailor. The person who takes possession is known as a bailee. When the bailment is for the benefit of both parties or for the sole benefit of the bailor, the bailor has a duty to those whom he should expect to use the property, or be endangered by its probable use, to use reasonable care to make it safe for use in a manner for which, and by a person for whose use, it is bailed, or to disclose its actual condition to those who may be expected to use it. A failure to fulfill that duty is negligence."

[5]Plaintiff's special instruction No. 5 read as follows: "The duty of the owner of a vehicle is to use due care in the operation and control of the vehicle. In the absence of special circumstances an owner of a vehicle has no duty to control the conduct of third persons resulting from the keys having been left in the vehicle. [¶] However, where the owner knew or should have known of special circumstances which create a reasonably foreseeable risk of harm from the use or operation of the vehicle, if the keys are left in the vehicle, then the owner of the vehicle has a duty to use reasonable care to protect the general public from such risks. [¶] Evaluation of the evidence to determine if special circumstances exist should include a consideration of the foreseeability of the chance of someone intermeddling with the vehicle, as well as the magnitude of potential harm or injury from use of the vehicle. You may take into consideration the type of vehicle, the location where the vehicle was left, the condition of the vehicle, and all other factors which are established by the evidence. [¶] If from your consideration of the evidence you find that the owner of the vehicle knew or should have known of the existence of special circumstances which created a reasonably foreseeable risk of harm or injury from the potential use of the vehicle, then you shall find that the owner had a duty to use due care to protect third persons from harm arising from its operation. [¶] The failure to fulfill such duty is negligence."

tion permitted the jury to find liability on the basis of a lesser showing than was required under the instruction on the duty of a bailor for hire.[6]

"As a general rule, it is improper to give an instruction which lacks support in the evidence, even if the instruction correctly states the law." (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946].) However, error will be found only where there is no evidence to support the instruction. (See *ibid.*)

Here, the record contains evidence from which the jury could have found that no bailment was created. Both at trial and in deposition, defendant stated that no one from Atkinson had ever asked to rent, borrow or use the manlift. At other points, he testified that such a request had been made and that he had agreed on condition that Atkinson first repair the broken cable. The jury could have believed either account.

Hence, defendant's first challenge to the special circumstances instruction fails. Plaintiff was entitled to instructions on alternative, inconsistent theories since the record contains support for both.

Next, defendant argues that, assuming no bailment existed and Atkinson's use of the manlift was unauthorized, the record provides no basis for the imposition of a duty of care under the special circumstances exception because the means by which plaintiff suffered harm was not foreseeable. Specifically, he contends that he discharged any duty that may have existed when he warned the Atkinson supervisors that the manlift was in a dangerous condition and secured their agreement to repair it.[7] Defendant contends that he could not have foreseen that the supervisors would direct plaintiff to use the manlift before it was repaired or that they would fail to warn plaintiff of the danger. For that reason, the special circumstances recognized in the case law and enumerated in plaintiff's special instruction are, in his view, inapplicable.

In *Richards, supra,* 43 Cal.2d 60, the plaintiff alleged that he suffered personal injuries when his motorcycle was struck by an automobile negli-

---

[6]Defendant contends that he fulfilled the duty of a bailor for hire when he warned the Atkinson supervisors that the manlift was in a dangerous condition. This contention cannot withstand close scrutiny. Under the instruction given and the authorities cited by defendant, he had a duty to warn not only the bailee but also third persons who might be expected to use the manlift. (See *ante,* fn. 2; *Tierstein* v. *Licht* (1959) 174 Cal.App.2d 835, 840-841 [345 P.2d 341]; Rest.2d Torts, § 408.) Defendant argues unpersuasively that he could not have foreseen that an Atkinson employee might use the unrepaired machine without direction or warning from one of the supervisors. The record belies that claim. (See *ante,* p. 579.)

[7]The evidence is conflicting as to whether defendant clearly identified the defect or advised the Atkinson supervisors of the danger it posed. For purposes of discussion, defendant's account will be accepted.

gently driven by a thief. Plaintiff sued the Stanleys, owners of the car, alleging that Mrs. Stanley carelessly left it unattended on a public street with the doors unlocked and the key in the ignition. This court affirmed a judgment of nonsuit for the Stanleys, holding that the duty of the owner of an automobile to exercise reasonable care in its management does not include a duty to remove the key so that persons on the highway will be protected from the risk of negligent driving by thieves. (*Id.*, at p. 66.)

The *Richards* court focused on the extent to which a risk of harm to the plaintiff was foreseeable. Foreseeability, in the court's analysis, was relevant in the first instance to the determination of the scope of the owner's duty and only thereafter to the existence of proximate cause. (43 Cal.2d at pp. 63-68.) The court acknowledged that recognition of a duty of care may turn on the foreseeability of a risk of harm, a question generally left to the jury as part of its determination of the causation element. (*Id.*, at p. 66.) However, "[n]ecessarily involved in submitting the case to the jury . . . is a preliminary determination that, granted a foreseeable risk, a duty arises." (*Ibid.*)

The *Richards* court distinguished between the question of the degree to which risk of harm is *foreseeable* and the question of whether that risk is *unreasonable*. The court indicated that the latter inquiry is a question of law, determinative of the existence of a duty. "The problem is not answered by pointing out that there is a foreseeable risk of negligent driving on the part of thieves. There is a *foreseeable* risk of negligent driving whenever anyone drives himself or lends his car to another. That risk has not been considered so *unreasonable,* however, that an owner is negligent merely because he drives himself, or lends his car to another, in the absence of knowledge on his part of his own or the other's incompetence. Moreover, by leaving the key in the car the owner does not assure that it will be driven, as he does when he lends it to another. At most he creates a risk that it will be stolen and driven. The risk that it will be negligently driven is thus materially less than in the case in which the owner entrusts his car to another for the very purpose of the latter's use." (43 Cal.2d at p. 65, italics added.)[8]

---

[8]The court's reluctance to impose a duty was heightened by a concern that a disparity would be created between the treatment afforded an owner whose car was stolen and one whose car was used by another person with the owner's permission. By statute, the negligence of a person driving a motor vehicle with the owner's permission is imputed to the owner. (See former Veh. Code, § 402, now renumbered § 17150 et seq.) However, the statute places a limit on the owner's liability. (Veh. Code, § 17151.) The imposition of common law negligence liability on the owner of a stolen car, by contrast, would subject the owner to unlimited liability. This anomalous result would follow even though "the risk created by the owner of the stolen car by leaving the key therein was materially less than that created by the owner who gave permission to another to use his car." (*Richards, supra,* 43 Cal.2d at p. 68.)

*Richards* did not preclude the imposition of liability in all cases. The court noted that "Mrs. Stanley did not leave her car in front of a school where she might reasonably expect irresponsible children to tamper with it [citation], nor did she leave it in charge of an intoxicated passenger . . . ." (43 Cal.2d at p. 66.) Thus, recognition of a duty might be appropriate where special circumstances were established which made the risk of harm more foreseeable and unreasonable. (*Ibid.*)

Such circumstances were presented only a year later in *Richardson v. Ham, supra,* 44 Cal.2d 772. There, a 26-ton bulldozer was left unlocked on an unfenced mesa. One evening, intoxicated youths managed to start the engine and set the bulldozer in motion, but were unable to stop it. They jumped off, and the driverless bulldozer went over the edge of the mesa and down the hill. Before stopping, it blazed a trail of destruction across a freeway, through an occupied house, and into a housetrailer and car. Several people were injured. (*Id.,* at pp. 774-775.)

The court held that *Richards* was not controlling, since "the kinds of foreseeable intervening conduct by third parties as well as the risks created by such conduct" in the two cases were "materially different." (44 Cal.2d at p. 775.) First, it was observed that the unusual degree of curiosity aroused by bulldozers makes "intermeddling" by children or other onlookers reasonably foreseeable. (*Id.,* at p. 776.) It is also foreseeable that such persons will not know how to operate the equipment. For these reasons, the owner of a bulldozer, unlike the car owner in *Richards* who might have no reason to foresee that a thief would be an incompetent driver, should foresee that "[a]n intermeddler who starts a bulldozer accidentally or otherwise may not be able to stop it . . . ." (*Ibid.*) Accordingly, it was held that the owners of the bulldozer had a duty to exercise reasonable care to protect the plaintiffs against injuries arising from its operation by intermeddlers. (*Ibid.*)

Special circumstances were also present in *Hergenrether* v. *East, supra,* 61 Cal.2d 440, in which a partially loaded two-ton truck was parked for the night in a "skid-row" area. The driver, an employee of the truck's owner, left the doors of the truck unlocked and the key in the ignition. That evening the truck was stolen and struck plaintiffs' vehicle when the thief negligently veered across the center line of a highway. (*Id.,* at pp. 441-442.)

The court concluded that the owner and driver of the truck owed a duty of care to the plaintiffs. "The special circumstances present in *Richardson* [v. *Ham, supra,* 44 Cal.2d 772] and *Murray* [v. *Wright* (1958) 166 Cal.App.2d 589 (333 P.2d 111)[9]], and those suggested in *Richards* [, *supra,*

---

[9]In *Murray* v. *Wright, supra,* 166 Cal.App.2d 589, special circumstances were found where a used car dealer left keys in cars parked on his lot, permitting prospective purchasers—or thieves—to drive them away.

43 Cal.2d 60] are not, of course, the only circumstances which justify the imposition of liability—rather each case must be considered on its own facts to determine whether the joint effect of them in toto justifies the conclusion that the foreseeable risk of harm imposed is unreasonable, and that the defendant owner or one in charge of a vehicle has a duty to third persons in the class of the plaintiffs to refrain from subjecting them to such risk." (*Hergenrether* v. *East, supra,* 61 Cal.2d at p. 445.)

The *Hergenrether* court identified a number of special circumstances which justified the recognition of a duty. Those included the location in which the truck was left, the length of time the defendants intended to leave it there, the fact that the safe and proper operation of a two-ton truck was not a matter of common knowledge, and the fact that such a vehicle could cause greater harm than an ordinary vehicle when not properly controlled. (61 Cal.2d at p. 445.)

Another special circumstances case is *Enders* v. *Apcoa, Inc., supra,* 55 Cal.App.3d 897. *Enders* was an action by a police officer injured in a collision with a car he was pursuing. The car had been stolen from the defendant's fee parking lot, where the attendant had left it with the key in the ignition, defendant's usual practice.

The Court of Appeal reversed a summary judgment for defendant. *Richards* was distinguished on the ground that it did not involve the "special circumstance" of police intervention. The court concluded not only that such intervention was foreseeable, but that it was also foreseeable that a thief would attempt to evade arrest and would drive negligently in doing so. "Where it is foreseeable that the manner of driving will be negligent, the likelihood of injury to the arresting officer and/or to innocent third parties is also foreseeable. Under such circumstance, the result of injury being foreseeable, there arises the duty not to conduct oneself in such a negligent way as to be a cause of the injury . . . ." (*Enders* v. *Apcoa, Inc., supra,* 55 Cal.App.3d at p. 905.)

The "special circumstances" requirement developed in the foregoing cases and incorporated into the language of plaintiff's special instruction has not proven to be a particularly helpful aid to analysis. As this court has recently stated, "[t]he 'special circumstance' to which we look in determining whether the owner operator of a vehicle owes a duty to third parties in the manner in which the vehicle is secured when not in use is nothing more than a test of foreseeability of harm." (*Palma* v. *U.S. Industrial Fasteners', Inc.* (1984) 36 Cal.3d 171, 186 [203 Cal.Rptr. 626, 681 P.2d 893].)

Three Court of Appeal opinions have questioned the underlying rule of nonliability announced in *Richards*. (*Hosking* v. *San Pedro Marine, Inc.*

(1979) 98 Cal.App.3d 98 [159 Cal.Rptr. 369]; *Kiick* v. *Levias* (1980) 113 Cal.App.3d 399 [169 Cal.Rptr. 859]; *Archer* v. *Sybert* (1985) 167 Cal.App.3d 722 [213 Cal.Rptr. 486].)[10] These opinions have cited empirical studies which demonstrate that, contrary to the conclusion drawn in *Richards*, "it is foreseeable to a reasonably prudent driver that if the keys are left in the ignition of an unattended vehicle, the risk of harm to innocent third persons from the reckless driving of a car thief is substantially increased." (*Hosking* v. *San Pedro Marine, Inc., supra,* 98 Cal.App.3d at pp. 104-105, fn. 4; accord *Kiick* v. *Levias, supra,* 113 Cal.App.3d at p. 404; *Archer* v. *Sybert, supra,* 167 Cal.App.3d at pp. 727, fn. 3, 729; see generally Peck, *An Exercise Based Upon Empirical Data: Liability for Harm Caused by Stolen Automobiles* 1969 Wis.L.Rev. 909; Note, *Car Owner Leaving Key in Vehicle Has a Duty to Third Person Injured by Thief* (1965) 12 UCLA L.Rev. 1260, 1264.) One of the opinions also criticized the duty analysis supporting the *Richards* holding as inconsistent with the principles of modern California tort law. (*Kiick* v. *Levias, supra,* 113 Cal.App.3d at pp. 402-404.)

It is not necessary to determine here whether the *Richards* no-duty rule has any continuing vitality.[11] Indeed, neither the general rule of nonliability from *Richards* nor the "special circumstances" exception to that rule is applicable. Fearing the *Richards* rule, plaintiff has done his able best to squeeze the facts of his case into the ill-fitting armor of the "special circumstances" exception. Just how poor the resulting fit is can be seen from a comparison between the facts here and those in the *Richards* line of cases discussed above.

Unlike the manlift here, the vehicle in each of those cases was, so far as can be determined from the opinions, free of hidden defects and safe for its intended use. (*Richards, supra,* 43 Cal.2d 60; *Richardson* v. *Ham, supra,* 44 Cal.2d 772; *Hergenrether* v. *East, supra,* 61 Cal.2d 440; *Murray* v. *Wright, supra,* 166 Cal.App.2d 589; *Enders* v. *Apcoa, Inc., supra,* 55

---

[10]This court recently noted but did not reach the questions raised in these Court of Appeal opinions regarding the continued viability of *Richards*. (*Palma* v. *U.S. Industrial Fasteners, Inc., supra,* 36 Cal.3d at p. 186, fn. 13.)

[11]I am in full agreement with the analysis presented by Justice Mathew O. Tobriner in his landmark opinion for the court in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. In *Dillon,* Justice Tobriner demonstrated that the concept of duty is "a legal device of the latter half of the nineteenth century designed to curtail the feared propensities of juries toward liberal awards. 'It must not be forgotten that "duty" got into our law for the very purpose of combatting what was then feared to be a dangerous delusion (perhaps especially prevalent among juries imbued with popular notions of fairness untempered by paramount judicial policy), viz., that the law might countenance legal redress for all foreseeable harm.'" (*Id.,* at p. 734, quoting Fleming, An Introduction to the Law of Torts (1967) p. 47.) Accordingly, if the question were squarely presented here, I would overrule the *Richards* no-duty rule.

Cal.App.3d 897.) Thus, those cases do not present a question of the owner's liability for failure to protect against a risk of harm posed by a hidden defect.

In addition, the plaintiffs in each of the cited cases were injured as the result of the unauthorized and negligent operation of the unsecured vehicle by a third person. In this case, by contrast, the injury was suffered by one of the persons operating the vehicle. It may be assumed that plaintiff was an unauthorized user of the manlift since, at most, its use had been authorized only if it were repaired. Even so, plaintiff was *not* a thief. As far as he knew, his use of the manlift was fully authorized. Moreover, while plaintiff's supervisors may have been negligent in causing the unrepaired manlift to be used, the *operation* of the vehicle by plaintiff and his coworker, Duren, who were both unaware of the defect, was not negligent.

Finally, no risk of harm to the plaintiffs or a class of which they were members was foreseeable in the cited cases, absent the intervening negligence of third persons. In this case, a substantial risk of harm was foreseeable even without such intervening negligence. Defendant could reasonably have foreseen, wholly apart from any action by the supervisors, that an Atkinson worker, finding the manlift unsecured and having no reason to know of its hidden defect, would assume from its presence in the equipment yard that it was available for use and take it without direction—or warning—from a supervisor. It was also reasonably foreseeable that even careful operation of the manlift under those circumstances would result in injury.

The fortuity that there was intervening negligence in this case does not relieve defendant of his duty toward plaintiff. When an injury results from a later cause of independent origin, the question of proximate cause "'revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If either of these questions is answered in the affirmative, then the defendant is not relieved of liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable and that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries.'" (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 521 [150 Cal.Rptr. 1, 585 P.2d 851]; *Akins* v. *County of Sonoma* (1967) 67 Cal.2d 185, 199 [60 Cal.Rptr. 499, 430 P.2d 57]; see also *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947]; *Gibson* v. *Garcia* (1950) 96 Cal.App.2d 681, 684-685 [216 P.2d 119].) While these principles are stated in the context of a proximate cause analysis, they are equally applicable in the duty

context. (See *Premo* v. *Grigg* (1965) 237 Cal.App.2d 192, 195 [46 Cal.Rptr. 683]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 496, p. 2762.)

Even assuming that defendant could not reasonably have foreseen the intervening negligence of plaintiff's supervisors, the evidence at trial provided ample support for a finding of liability. The harm that actually occurred was precisely the harm which was foreseeable. Accordingly, even if no intervening negligence was foreseeable, the jury could reasonably have found that defendant's negligent failure to prevent plaintiff's use of the vehicle or warn him of the danger was a substantial contributing cause of plaintiff's injury and that the injury was of a type which defendant should have foreseen.

The foregoing comparison between the facts in the "special circumstances" cases and the present case suggests that, at worst, plaintiff's effort to conform his instruction to the special circumstances approach might have led the jury to the false belief that it must find a reasonable foreseeability of negligence on the part of third persons before it could impose liability on defendant for leaving the keys in the vehicle. If the instruction had such an effect, it was to defendant's advantage, not prejudice.

Defendant relies on *Richards* to argue that the special instruction misstates the law by permitting the recognition of a duty on the basis of nothing more than a "reasonably foreseeable risk of harm." He urges that *Richards* permits recognition of a duty only where the foreseeable risk of harm is *unreasonable*.

Outside the key-in-the-ignition setting, the question whether a risk of harm is unreasonable is no longer treated by this court as requiring a separate determination. Duty is now analyzed in terms of the "'sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection . . . .'" (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) Foreseeability of the risk is foremost among those considerations. (*Ibid.*) Recent decisions have not addressed the question of whether the risk of harm is unreasonable as a factor distinct from the question of foreseeability. (See, e.g., *Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d 49.)

Because it calls for a separate determination of the unreasonableness of the risk, the *Richards* analysis is out of step with these developments. Continued adherence to the analysis in "key-in-the-ignition" cases would only perpetuate an anachronism and cause further confusion. Accordingly, the reasoning of *Richards* should be disapproved to the extent that it requires

the unreasonableness of the risk of harm posed by a defendant's conduct to be determined separately from the foreseeability of the risk.

In light of this reasoning, the trial court did not err by giving plaintiff's special instruction. Insofar as the judgment reflects the jury's verdict imposing liability on defendant for plaintiff's injuries, it should be affirmed.

## III.

Plaintiff's cross-appeal seeks reversal of the damages verdict and remand for a new trial on the issue of damages. Two grounds for reversal are asserted. Plaintiff contends that two jurors in the damages phase of trial engaged in prejudicial misconduct. He also argues that the trial court erred by instructing the jury that it could not award damages for medical expenses that had been paid by the workers' compensation insurance carrier for plaintiff's employer, Atkinson.[12] The trial court, rejecting both arguments, denied plaintiff's motion for new trial or additur.

Article I, section 16 of the California Constitution guarantees the right to trial by jury. The right to unbiased jurors is an "'inseparable and inalienable part'" of that right. (*People* v. *Hughes* (1961) 57 Cal.2d 89, 95 [17 Cal.Rptr. 617, 367 P.2d 33]; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 953 [182 Cal.Rptr. 176].) The guarantee requires that all 12 of the jurors be impartial. (*Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356, 360 [97 Cal.Rptr. 589].)[13]

Concealment of bias on voir dire constitutes juror misconduct. (*Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132]; *Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 955 [161 Cal.Rptr. 377].) The existence of bias at the time of voir dire may be inferred from utterances made in the jury room and shown by the juror declarations. (*Smith* v. *Covell, ibid.*)[14] An intent to disregard the law as

---

[12]Since the verdict should be reversed on the ground of juror misconduct, I do not reach the other issues presented.

[13]The significance of the requirement is that all members of the jury should be free of bias and prejudice, rather than that there should be 12 such jurors. The parties in a civil case may, of course, agree in open court to a jury consisting of less than 12. (Cal. Const., art. I, § 16.)

[14]This court has declined to decide whether unintentional concealment of bias constitutes misconduct. (See *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 110, fn. 5; cf. *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 431 [82 Cal.Rptr. 1] [juror's concealment of bias on voir dire is misconduct whether intentional or unintentional].)

It is unnecessary to decide that question here. Only 21 days elapsed between the voir dire, in which the jurors affirmed their lack of bias toward the award of damages for pain and suffering, and the deliberations, in which Jurors Pace and Van Eegan stated that they would refuse to award such damages no matter what the law required. (See *post,* pp. 590-591.) *A strong inference arises that these two jurors held their bias against the award of damages for pain and suffering at the time of the voir dire and intentionally concealed it.*

given by the court is evidence of bias. Any concealment of that fact warrants reversal. (*Ibid.*) Concealed racial bias toward a party is also grounds for reversal. (*Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 110.) Concealment of bias on voir dire by a single juror may be sufficient to destroy the integrity of the verdict. (*Id.,* at p. 111; see *Clemens* v. *Regents of University of California, supra,* 20 Cal.App.3d at p. 360.)

It is also impermissible for jurors to "receive or communicate to fellow jurors information from sources outside the evidence in the case." (*Smith* v. *Covell, supra,* 100 Cal.App.3d at p. 952; see also *Andrews* v. *County of Orange, supra,* 130 Cal.App.3d at p. 958; *People* v. *Lessard* (1962) 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46].)

"It is well settled that a presumption of prejudice arises from any juror misconduct." (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) The presumption of prejudice is equally applicable in criminal and civil cases. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171], cert. dism. (1983) 459 U.S. 1190 [75 L.Ed.2d 422, 103 S.Ct. 1167].) "However, the presumption is not conclusive; it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.] Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued. [Fn. omitted.]" (*Ibid.*)[15]

The allegations of juror misconduct in this case are based upon the declarations of four members of the jury at the trial on damages.[16] According to the declarations of Jurors Novicoff and Brown, Juror Pace stated during the deliberations that she would not award anything for pain and suffering,

---

[15]On review of an order denying a new trial this court must review "the entire record, including the evidence," to make an independent determination whether the error was prejudicial. (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 872 [135 Cal.Rptr. 647, 558 P.2d 545]; *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417, fn. 10; Cal. Const., art. VI, § 13.)

[16]As a preliminary matter, a litigant seeking a new trial on the ground of juror misconduct must show by sworn affidavits or declarations under penalty of perjury (Code Civ. Proc., § 2015.5) that neither he nor his attorney knew of the juror misconduct until after the verdict was returned. (*Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 103.) The declaration of plaintiff's counsel to that effect was filed with the motion for new trial, in partial compliance with the requirement. No comparable declaration by plaintiff was submitted. Defendant failed to raise this omission in the trial court as a basis for denial of the new trial motion and has not asserted it before the Court of Appeal or before this court in opposing plaintiff's cross-appeal.

no matter what the law required. Juror Van Eegan expressed agreement and stated that "our insurance rates are so high" as a result of such awards.

The declarations also allege that Juror Van Eegan stated during the deliberations that her husband had been injured several times on a construction job but had never received a large award of damages for pain and suffering and had always returned to work. Juror Pace complained that her husband had not received a large pension. According to Juror Engle, Pace also stated to him before the deliberations began that "[t]he first thing we have to do is weed out the bleeding hearts that want to give this man a lot of money, just because he's black."

I cannot see how these declarations could be deemed to be insufficient to establish prejudicial juror misconduct. These statements clearly constitute evidence of concealed bias and the impermissible communication of outside evidence.

The statements constituted serious misconduct from which prejudice to the plaintiff must be presumed unless rebutted by the defendant or by this court's independent review of the record. Since the presumption has not been rebutted, I would reverse the judgment for damages and order a new trial on that issue.

The decision of the Court of Appeal in *Smith* v. *Covell, supra,* 100 Cal.App.3d 947, which concerned similar instances of juror misconduct, is instructive. That case involved an action by a wife and husband for personal injuries and loss of consortium stemming from back injuries allegedly received by the wife in an automobile accident. On voir dire, one of the prospective jurors revealed that he had a congenital lower back condition that had been aggravated by a sports injury. He stated that he would, if selected, decide the case solely on the basis of the evidence presented, disregarding his experience with his own back problem. Once on the jury, however, he told fellow jurors that "when his back 'went out' it 'went out right away' and 'hurt right away.'" (*Id.,* at p. 952.)

These statements bore on a critical factual issue in this case. The defendant contended that the amount of time that elapsed between the accident and Mrs. Smith's first complaint of lower back pain established that her injury was not caused by the automobile accident. Expert witnesses for the two sides disagreed sharply on this point. (*Smith* v. *Covell, supra,* 100 Cal.App.3d at pp. 951, 954.)

Several other jurors stated during the deliberations in *Smith* v. *Covell* that the husband should not be awarded damages on his cause of action for loss

of consortium since he was obligated by his marriage vow to stay with his wife. These same jurors had agreed on voir dire to follow the law that the court gave them without hesitation. (*Smith* v. *Covell, supra,* 100 Cal.App.3d at p. 954.) Finally, yet another juror stated during deliberations that he opposed people suing one another and that awarding high verdicts in personal injury suits caused high insurance rates. (*Id.,* at p. 955.)

The jury awarded $10,000 in damages on the wife's cause of action for personal injuries. Despite uncontroverted evidence of loss of consortium, they returned a verdict of zero damages on the husband's cause of action. After judgment was entered, the trial court denied plaintiffs' motion for a new trial.

The Court of Appeal reversed, ordering a new trial on the issue of damages on both causes of action. The court held that the statements of the juror regarding his own back condition and the statements by other jurors concerning the impact of personal injury litigation on insurance rates were impermissible communications of outside information constituting prejudicial juror misconduct. (*Smith* v. *Covell, supra,* 100 Cal.App.3d at pp. 952, 954, 955.) Those statements, and the statements concerning the husband's lack of entitlement to damages, were also evidence that the jurors had concealed their biases against plaintiffs on voir dire, an independent ground for reversal. (*Ibid.*)

The court in *Smith* v. *Covell* apparently had available to it a transcript of the voir dire from which to determine the topics covered by the attorneys' questions and the responses given by the prospective jurors. No reporter's transcript of the voir dire in the second trial was requested or prepared in the present case.

The majority contend that the absence of a transcript leaves a reviewing court ill-equipped to evaluate the claim of concealed bias. (Maj. opn., *ante,* at p. 574.) However, plaintiff's counsel asserts in his brief, as he did in his declaration under penalty of perjury in support of plaintiff's motion for new trial, that he queried all of the jurors on voir dire regarding their attitude toward damages for pain and suffering, and they all affirmed their lack of bias against awarding them. Defendant does not dispute this assertion. What more would a transcript show?

Neither *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717] nor *Dunford* v. *General Water Heater Corp.* (1957) 150 Cal.App.2d 260, 264 [309 P.2d 958] support the majority's position. In both cases, the reviewing court relied on the fact that the trial court denied a motion for new trial only after it had considered coun-

teraffidavits or oral testimony of jurors denying the allegations of misconduct. (*Bardessono* v. *Michels, supra,* 3 Cal.3d at p. 796; *Dunford* v. *General Water Heater Corp., supra,* 150 Cal.App.2d at p. 265.) Here, defendant offered no evidence to rebut the evidence of misconduct, nor does he dispute the account of the voir dire proceeding offered by plaintiff's counsel.

Further, the *Dunford* court stressed the inadequacy of the particular affidavits of counsel in that case to serve as substitutes for a transcript of the voir dire proceedings. (*Dunford, supra,* 150 Cal.App.2d at pp. 264-265.) The affidavits were "equivocal and [did] not present a complete and accurate picture of the [voir dire] questions and answers. For example, Mr. Strock in his affidavit avers: 'A general question I often put to prospective jurors during that *voir dire* examination, heard by MISS GOODWIN, and probably directly addressed to her, was in effect . . . .'" (*Ibid.*) The court asked rhetorically, "[b]y what character of clairvoyance can this court determine from such inconclusive averments whether Miss Goodwin was asked questions which, if truthfully answered, would have brought out bias and prejudice, if any existed?" (*Id.,* at p. 265.)

Here, the uncontradicted declaration of plaintiff's counsel regarding the voir dire proceeding suffers from no such infirmity. On the contrary, it is clear, unequivocal and unambiguous.

In this case, two jurors intentionally concealed their views when questioned at the time of voir dire. Then they expressed during deliberations an intent to disregard the law regarding plaintiff's right to recover damages for pain and suffering. At least one juror expressed agreement with this view during the deliberations. These actions were serious misconduct which deprived plaintiff of his right to an impartial and unbiased jury. (*Smith* v. *Covell, supra,* 100 Cal.App.3d at pp. 952-955; *Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 766-767 [206 Cal.Rptr. 803].) Juror Pace's comment on plaintiff's race also evidenced bias and lack of impartiality. (*Id.,* at pp. 765-766.)

In addition, the statements by Juror Van Eegan regarding her husband's experience with construction job injuries and the effect of personal injury litigation on insurance rates, as well as the statement by Juror Pace concerning the amount of her husband's pension, improperly brought outside information before the jury. (*Smith* v. *Covell, supra,* 100 Cal.App.3d at pp. 954-955; *Tapia* v. *Barker, supra,* 160 Cal.App.3d at p. 766.)

Defendant argues that minor discrepancies in the wording used in the four juror declarations to describe Juror Pace's statement about pain and suffer-

ing created a substantial conflict as to the facts.[17] According to defendant, the trial court resolved that conflict by finding that no misconduct occurred, a determination defendant contends may not be disturbed on appeal.

In *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d at page 108, this court held that when an issue of jury misconduct is tried on declarations and "'there is a *substantial conflict* in the facts stated, a determination of the *controverted* facts by the trial court will not be disturbed.'" (Italics added.) Defendant's reliance on that case is misplaced. In *Weathers,* as in this case, the party seeking a new trial submitted juror declarations alleging misconduct by other members of the jury. The opposing party, unlike defendant in this case, submitted counterdeclarations by other jurors. The counterdeclarations "flatly contradicted some of the allegations made in the dissenting jurors' declarations, were silent as to others, and were evasive as to still others." (*Ibid.*)

Here, defendant submitted no such counterdeclarations. As a result, no substantial conflict exists regarding the facts of juror misconduct which would require deference to the trial court's determination. Furthermore, defendant has failed to rebut the presumption of prejudice arising from that misconduct.

As previously noted, no record of the damages trial was requested or prepared. As a result, it is impossible to determine the amount of the damages that plaintiff sought to establish or the strength of his proof. That information could aid in establishing affirmatively that the verdict for $200,000 in damages was lower than it would have been absent the jury misconduct.

However "[i]t is well settled that a presumption of prejudice arises from any juror misconduct." (*People* v. *Honeycutt, supra,* 20 Cal.3d 150, 156; accord *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, 416, cert. dism. (1983) 459 U.S. 1190.) The presumption may be rebutted by affirmative evidence or by "a reviewing court's examination of the entire record to

---

[17]Defendant urges that the wording differences are "significant," but does not explain why. The relevant portions of the four declarations are set forth below.

Engle declaration: "Mrs. Moche asked Mrs. Pace, 'How can you just throw this issue out all together?' Mrs. Pace's reply was, 'I am not going to award any money for pain and suffering, I do not care what the law says,' or words to that effect."

Novicoff declaration: "When we started discussing the issue of pain and suffering, Marie Pace made the statement that she would not award anything for pain and suffering no matter what the law said. In fact she refused to vote on this issue."

Brown declaration: "She said 'I am not going to award anything for pain and suffering, no matter what the law says.'"

Webber declaration: "I recall they [Pace and Van Eegan] would not award separate monies for the pain and suffering category . . . ."

determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Id.*, at p. 417.) In conducting this examination, the reviewing court may consider "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Ibid.*)

Here, the evidence of misconduct is clear and uncontradicted. The misconduct was serious, going to the heart of plaintiff's entitlement to damages following the separate verdict on liability. Finally, the probability of prejudice can be discerned from several points that are clearly established. First, the misconduct bore directly on the single issue before the jury. Second, the verdict was unanimous. It therefore necessarily reflected the views of Jurors Pace and Van Eegan. Finally, there is no evidence that either Pace or Van Eegan retracted or reconsidered their announced refusal to award damages for pain and suffering or that the other juror who agreed with their position had a change of heart before the verdict was reached. Thus, it appears likely that the verdict reflected a downward adjustment to accommodate those views.

Where—as here—the jury returns a unanimous verdict for the plaintiff, it is clear that the misconduct of the offending jurors has not so influenced the other jurors as to sway them to vote for a defense verdict. Rather, the potential for prejudice to plaintiff stems from the likelihood that their improper statements, made prior to the vote, influenced other jurors to agree to a lower, compromise damage award, and thus "influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).)

The unanimity of the verdict strengthens the inference that the aversion of the two misbehaving jurors to pain and suffering awards and to high personal injury awards generally was accommodated by the rest of the jury in arriving at a figure which these two eventually found palatable. However, this conclusion lends no support to the assertion that reliance on jury unanimity would mean that the presumption of prejudice could never be rebutted in any case. Indeed, the probability of actual prejudice in this case would have been effectively negated had the vote been ten to two or nine to three (see Cal. Const., art. I, § 16) with Jurors Pace and Van Eegan voting in the minority (see Code Civ. Proc., § 618). That voting pattern would indicate not only that the dissenting jurors had failed to convince the court to adopt their view, but also that there had been no improper downward compromise in the damage award.

Defendant has not identified, and an independent review of the record has not revealed, any evidence showing that prejudice did not result from the

serious jury misconduct established by plaintiff. Accordingly, the presumption of prejudice requires reversal of that portion of the judgment reflecting the verdict for damages returned in the second trial.

## IV.

I would also like to address several points in Justice Mosk's separate concurring opinion. The opinion suggests that the declarations in this case are inadmissible because the statements to which they refer are not "objective facts."[18] I would reject this novel theory.

The declarations are clearly admissible as evidence of "statements made . . . either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a); *In re Stankewitz, supra,* 40 Cal.3d at p. 397.) The declarations were properly offered as evidence of the statements themselves, not for the prohibited purpose of showing the *effect* of the statements on a juror "either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a); see *People* v. *Pierce, supra,* 24 Cal.3d at p. 208, fn. 4.)

A distinction must be drawn between two questions: (1) whether a statement is admissible to show the effect on the jurors' mental processes of *other,* improper statements; and (2) whether evidence of a statement may be admitted to show that the statement itself was improper, after which a court may determine the likelihood that the statement influenced the verdict. Under Evidence Code section 1150, the answer to the first question is clearly "no." It is equally clear that the answer to the second question is "yes." Unless a court may draw reasonable inferences regarding the likely effect of improper statements, there is no point in admitting evidence of such statements. (See *People* v. *Pierce, supra,* 24 Cal.3d at pp. 208-209.)

*People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132] contains the following language, which is squarely on point: "[J]urors' affidavits [may] be used to prove that one or more of the jurors concealed bias or prejudice on *voir dire.* (*People* v. *Gidney* [1937] 10 Cal.2d 138, 146 [73 P.2d 1186]; see *Williams* v. *Bridges* (1934) 140 Cal.App. 537 [35 P.2d 407].) This exception is now well settled (see e.g., *Kollert* v. *Cundiff* (1958) 50 Cal.2d 768, 773-774 [329 P.2d 897]; *People* v. *Castaldia* (1959) 51

---

[18]Justice Mosk suggests that "affidavits purportedly relating jury discussions" should be inadmissible. (See conc. opn., *ante,* at p. 575.) However, this court has decided unanimously that such affidavits are admissible. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 208 [155 Cal.Rptr. 657, 595 P.2d 91]; see *In re Stankewitz* (1985) 40 Cal.3d 391, 394-398 [220 Cal.Rptr. 382, 708 P.2d 1260].)

Cal.2d 569, 572 [335 P.2d 104]), and has been extended to allow the use of juror affidavits to show that a juror . . . did not intend to follow the court's instructions on the law and had concealed that intention on *voir dire.* (*Noll* v. *Lee* (1963) 221 Cal.App.2d 81 [34 Cal.Rptr. 223].)" (*Hutchinson, supra,* 71 Cal.2d at p. 348.) Those are precisely the reasons for which the declarations in this case were offered.

In *Hutchinson,* this court went on to observe that "[a]dmission of jurors' affidavits within the limits set by section 1150 protects the stability of verdicts, and allows proof by the best evidence of misconduct on the part of either jurors or third parties that should be exposed, misconduct upon which no verdict should be based." (71 Cal.2d at p. 350.)

The declarations here constitute proper impeachment evidence of the improper influences "open to sight, hearing, and the other senses and thus subject to corroboration." (*Hutchinson, supra,* 71 Cal.2d at p. 350.) They are not the same as the counterdeclarations held inadmissible in *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388. The *Hasson* counterdeclarations were offered to prove that diverting activities engaged in by jurors during trial did not prevent them from paying attention to the evidence presented, i.e., to prove a point about the subjective mental processes of the jurors. (*Id.,* at pp. 412-413; see *People* v. *Pierce, supra,* 24 Cal.3d at p. 208, fn. 4.) The declarations in the present case are more like the declarations in *Hasson* in which jurors reported having *observed* the diverting activities. The admissibility of those declarations was not questioned. (*Hasson, supra,* 32 Cal.3d at p. 410.)

In accordance with the decision in *Hasson,* I would decline "to obfuscate the clear line drawn in *Hutchinson* between proof of objectively ascertainable facts and proof of the subjective mental processes of jurors." (*Hasson, supra,* 32 Cal.3d at p. 414.)

Regarding the quantum of proof required to trigger the presumption of prejudice, the concurring opinion appears to advocate the adoption of a double standard. Apparently, Justice Mosk would require a much stronger showing to establish prejudicial misconduct in civil cases than he has found to be sufficient in criminal cases. If this result is intended, surely an explanation is required. Until now, the rule has been firmly established that the presumption of prejudice arising from jury misconduct is equally applicable in criminal and civil cases. (*Hasson, supra,* 32 Cal.3d at p. 417.)

Justice Mosk's dissenting opinion in *People* v. *Valles* (1979) 24 Cal.3d 121, 128 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116], supports the conclusion that the presumption of prejudice applies here. In that case,

Justice Mosk was concerned with the *possibility* that an alternate juror in a criminal trial, improperly sequestered with the regular jurors, might have communicated "agreement or disagreement, support or opposition, encouragement or disapproval, praise or derision, hope or frustration, or any of countless other emotions." (*Id.,* at p. 131.) His dissent concluded that "[e]ven if only one regular juror observed such a response on the part of the alternate—not necessarily from his speech, but from his gestures, attitude, or facial expressions—*it could well have a tilting effect on the ensuing vote.*" (*Ibid.,* italics added.) Accordingly, he would have held that the presumption of prejudice arose and required reversal. (*Id.,* at p. 132.)

Here, there is uncontradicted *evidence* that two jurors stated flatly to fellow jurors their refusal to follow the law regarding plaintiff's right to damages for pain and suffering. One of them also communicated directly to fellow jurors information from outside the record regarding the adverse effect of large personal injury awards on insurance rates.

This misconduct was even more likely than the misconduct in *Valles* to have a "tilting effect" on the verdict, albeit of a different nature. In *Valles,* the danger was that a juror or jurors otherwise inclined to acquit might be swayed to enter a guilty verdict. Here, the danger was that other jurors might be influenced by the improper statements to adjust the size of the damage award downward. Such a compromise is more likely than the 180 degree change from an innocent to a guilty verdict contemplated in *Valles.* What distinguishes these cases other than that one is civil and the other criminal?

Finally, the concurring opinion suggests that jury nullification—a power sometimes exercised by juries in criminal cases—should be invoked here to justify the brazen disregard of the law by these jurors in this civil case. (See conc. opn., *ante,* at pp. 576-577.) Even in the criminal setting, this court has never approved of jury nullification. A criminal defendant is not entitled in this state to an instruction informing the jury that it has this power. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 487-488, fn. 39 [194 Cal.Rptr. 390, 668 P.2d 697] (plur. opn.); see CALJIC No. 1.00 (4th ed. 1979).)

As the plurality stated in *Dillon,* "it cannot seriously be urged that, when asked by the jurors, a trial judge must advise them: 'I have instructed you on the law applicable to this case. Follow it or ignore it, as you choose.' Such advice may achieve pragmatic justice in isolated instances, but we suggest the more likely result is anarchy." (34 Cal.3d at pp. 487-488, fn. 39.)

In his separate opinion in *Dillon,* Justice Kaus argued that a nullification instruction should be given when the jury inquired specifically about this

power. (*Id.*, at pp. 490-493.) However, he agreed that "[t]o instruct on nullification at the outset of deliberations affirmatively invites the jury to consider disregarding the law. I understand the arguments against such a course and do not advocate it." (*Id.*, at p. 491.)

Moreover, the only area where jury nullification has been recognized is in the context of criminal trials. In a criminal case, the jury has the naked power to return a verdict of "not guilty" even where acquittal is inconsistent with the law given by the court. (*Dunn* v. *United States* (1932) 284 U.S. 390, 393-394 [76 L.Ed. 356, 358-359, 52 S.Ct. 189]; see *United States* v. *Powell* (1984) 469 U.S. 57, 65 [83 L.Ed.2d 461, 468, 105 S.Ct. 471, 477].)

As Judge Learned Hand once remarked in affirming a jury's guilty verdict on one count that was inconsistent with their acquittal on a related count, "[w]e interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity." (*Steckler* v. *United States* (2d Cir. 1925) 7 F.2d 59, 60, quoted in *Dunn* v. *United States, supra,* 284 U.S. at p. 393 [76 L.Ed. at p. 359] and in *United States* v. *Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1133; see *United States* v. *Powell, supra,* 469 U.S. at p. 65 [83 L.Ed.2d at p. 468, 105 S.Ct. at p. 477]; see generally Bickel, *Judge and Jury—Inconsistent Verdicts in the Federal Courts* (1950) 63 Harv.L.Rev. 649.)

This power is attributable to two unique features of criminal trials. First, a criminal jury has the right to return a general verdict which does not specify how it applied the law to the facts, or for that matter, what law was applied or what facts were found. (See Pen. Code, § 1150; *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 47 [121 Cal.Rptr. 269]; *United States* v. *Spock* (1st Cir. 1969) 416 F.2d 165, 180-183; cf. *People* v. *Davenport* (1985) 41 Cal.3d 247, 273-275 [221 Cal.Rptr. 794, 710 P.2d 861] [approving the requirement in Pen. Code, § 190.4, subd. (a) that the jury in a capital case make a "special finding" on the truth of each alleged special circumstance].)

Second, the constitutional double jeopardy bar prevents an appellate court from disregarding the jury's verdict in favor of the defendant and ordering a new trial on the same charge. (See *United States* v. *Powell, supra,* 469 U.S. at p. 65 [83 L.Ed.2d at p. 468, 105 S.Ct. at p. 477]; *Green* v. *United States* (1957) 355 U.S. 184, 188 [2 L.Ed.2d 199, 204, 78 S.Ct. 221]; *United States* v. *Dougherty, supra,* 473 F.2d at p. 1143 (conc. & dis. opn. of Bazelon, J.); cf. Scheflin & Van Dyke, *Jury Nullification: The Contours of a Controversy* (1980) 43 Law & Contemp. Probs. 51, 111.)

While jury nullification may be debatable in the criminal trial context, it certainly has no place in a civil trial where neither party has a right to a general verdict (see generally *United States* v. *Spock, supra,* 416 F.2d at pp. 180-183) and where there is no double jeopardy bar. Jury nullification is wholly inconsistent with the trial court's authority in a civil case to order a special verdict in which the jury finds the facts, leaving for the court the determination of the conclusions of law to be drawn from those facts. (See Code Civ. Proc., §§ 624, 625; *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 824 & fn. 18 [119 Cal.Rptr. 858, 532 P.2d 1226].)

It is also irreconcilable with the trial court's power to enter a judgment notwithstanding the jury's verdict (see Code Civ. Proc., § 629; *Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414, 417 [172 Cal.Rptr. 49]), or to order a new trial following a jury verdict which is contrary to law (see Code Civ. Proc., § 657, subd. 6; *Morris* v. *McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964 [132 Cal.Rptr. 37]; cf. *Fairmount Glass Works* v. *Coal Co.* (1933) 287 U.S. 474, 484-485 [77 L.Ed. 439, 445-446, 52 S.Ct. 252]; *Jayne* v. *Mason & Dixon Lines* (2d Cir. 1941) 124 F.2d 317, 319.) Specifically, and most importantly for purposes of the issue posed by this case, jury nullification cannot be reconciled with the well-established authority of a trial court to order a new trial on the ground of juror misconduct. (Code Civ. Proc., § 657, subd. 2; *Smith* v. *Covell, supra,* 100 Cal.App.3d at p. 955.)

Championing a jury's refusal to apply the law as instructed is inconsistent with the very notion of the rule of law. As the young Abraham Lincoln said in a related context, "let me not be understood as saying there are no bad laws, or that grievances may not arise for the redress of which no legal provisions have been made. I mean to say no such thing. But I do mean to say that although bad laws, if they exist, should be repealed as soon as possible, still, while they continue in force, for the sake of example, they should be religiously observed." (Address at the Young Men's Lyceum, Springfield, Ill., Jan. 27, 1837, in 1 The Complete Works of Abraham Lincoln (Nicholay & Hay edits. 1905) p. 44.)

The petition of defendant and appellant for a rehearing was denied May 29, 1986.