Filed 1/14/22  Kim v. Vivas CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| EILLEN KIM et al., | D078843 |
| Plaintiffs and Appellants, | (Super. Ct. No. RIC1903489) |
| v. | |
| JOSEPH VIVAS et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on December 27, 2021 be modified as follows:

On page 12, the following language is added to the end of the current text of footnote 1:

> In a petition for rehearing, the Kims dispute this conclusion.  They acknowledge they "did not devote a heading and separate argument to [Joseph and Yolanda's] duty to erect a fence or enclosure," but they contend they sufficiently raised the issue by describing the front yard as "unenclosed" in various statements in their opening brief.  We disagree.  The Kims' description of the front yard as "unenclosed" is a factual statement; it is not a legal argument regarding duty.  When the Kims discussed what

Joseph and Yolanda should have done, they did not make an argument based on a duty to install a fence.

On page 13, at the end of the first full paragraph ending in "tenant's supervision," a new footnote is added with the following language, which will necessitate renumbering of the subsequent footnotes:

> In their petition for rehearing, the Kims argue it was a disputed material fact whether the dogs were supervised. They cite evidence regarding Raymond's actions on the night Chung Ho Kim was fatally injured. But the relevant consideration in the duty analysis is not what occurred that night, but what Joseph and Yolanda were aware of prior to the incident. The Kims' petition does not address that consideration. We note that our use of the term "supervision" does not imply that the dogs must be in the immediate care and control of the tenant, merely that the tenant is present.

Appellants' petition for rehearing is denied.

There is no change in the judgment.

O'ROURKE, Acting P. J.

Copies to: All parties

2

Filed 12/27/21  Kim v. Vivas CA4/1 (unmodified opinion)
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EILLEN KIM et al., Plaintiffs and Appellants, v. JOSEPH VIVAS et al., Defendants and Respondents. | D078843 (Super. Ct. No. RIC1903489) |

APPEAL from a judgment of the Superior Court of Riverside County, Irma Poole Asberry, Judge.  Affirmed.

Law Offices of Chad A. Gerardi, Chad Anthony Gerardi; Thomas Vogele & Associates, Thomas A. Vogele and Timothy M. Kowal, for Plaintiffs and Appellants.

Demler, Armstrong & Rowland, Robert W. Armstrong and David A. Ring, for Defendants and Respondents.

Chung Ho Kim died tragically after encountering two unleashed dogs while on an evening walk in a residential area.  When one dog barked and approached, Kim stepped backward, fell, and suffered a fatal head injury. Kim's surviving spouse, Eillen Kim, and his children, Lawrance Kim and

Janett Kim, filed this lawsuit against the dogs' owner, Raymond Torres (Raymond), and his landlords, Joseph Vivas (Joseph) and Yolanda Vivas (Yolanda). The Kims alleged causes of action for negligence, negligence per se, premises liability, and wrongful death. Raymond is married to Joseph and Yolanda's daughter, Christal Torres (Christal). The Kims' claims against Raymond are not at issue in this appeal.

In the trial court, Joseph and Yolanda moved for summary judgment on the ground that they had no duty of care toward Chung Ho Kim because they did not own or keep the dogs, they had no actual knowledge of any dangerous or vicious propensities of the dogs, and they had no actual or constructive knowledge of any dangerous condition on their property. The Kims opposed the motion, primarily arguing that Joseph and Yolanda knew Raymond allowed the dogs to be unleashed in his front yard and they did nothing to stop him. The court found that Joseph and Yolanda did not owe Chung Ho Kim a duty of care and granted the motion.

The Kims appeal. On de novo review, we agree with the trial court that Joseph and Yolanda did not owe a duty of care to Chung Ho Kim under the circumstances here. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review of orders granting summary judgment, we recite the historical facts in the light most favorable to the Kims as the nonmoving parties. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 81.)

In 2014, Joseph and Yolanda moved out of their longtime family home in Corona, California and leased it to Christal and Raymond. In a written lease agreement, Christal and Raymond agreed not to use the home or

2

adjacent areas in such a way as to violate any law or ordinance. Failure to comply would be "grounds for termination of the tenancy, with appropriate notice to Tenant and procedures as required by law."

Christal and Raymond lived in the home with their two sons. They bought two Boxer dogs named Ollie and Maddie. The lease agreement allowed them to have two dogs as pets.

On social visits, Joseph and Yolanda observed the dogs. Joseph testified at deposition that the dogs were friendly and well-behaved. He had never seen the dogs act inappropriately or heard of any threatening behavior. Yolanda agreed. She testified that Ollie and Maddie were wonderful dogs, gentle and obedient to Raymond. But she did question Christal and Raymond when she saw the dogs outside without leashes. She asked whether they should have leashes, and Christal responded, " 'We've trained them. They only stay on the lawn area.' " Yolanda saw that the dogs remained on the lawn. If they went to the edge, Christal or Raymond would call the dogs and they would come back. Yolanda felt comfortable with that; it did not seem unsafe. Joseph had seen the dogs unleashed in the front yard as well. Both Joseph and Yolanda agreed that they would have done something if they felt the dogs were dangerous.

Raymond testified that the dogs were often in the front yard unleashed, but only when he or Christal was outside with them. The dogs had never run away. They normally remained in the yard, and only occasionally set foot on the neighboring sidewalk. The dogs had never bitten or attacked anyone. Raymond had never seen them act aggressively at all.

In April 2019, around 8:45 p.m., Raymond was in his garage with the garage door open. The dogs were laying in the front lawn. Raymond saw Chung Ho Kim walking on the adjacent sidewalk. Raymond told the dogs to

3

" 'stay,' " but Maddie stood and started "trotting" toward Kim. She barked, continued toward Kim, and barked two more times. The closest Maddie came to Kim was about three or four feet. Kim was waving his arms back and forth, possibly to warn off the dog. Kim stepped backward, away from Maddie, and fell.

Raymond saw Kim fall and ran toward him. A neighbor came over and called 911. Raymond put the dogs inside, grabbed his cell phone, and ran back outside. Paramedics arrived, but Kim died a couple days later from complications from blunt force head trauma.

An animal control officer interviewed Raymond after the incident. The officer issued four citations to Raymond, two for licensing violations and two for violating Corona's leash ordinance. That ordinance provides, in relevant part, "[N]o owner or keeper of any dog shall cause, permit or allow the dog to wander, stray, run or in any other manner be at large in or upon any public property or unenclosed private property in the city, except upon the premises of and under the immediate care and control of the owner or keeper of the dog." (Corona Mun. Code, § 6.12.120, subd. (A).)

The Kims filed this lawsuit against Raymond, Joseph, and Yolanda. The Kims alleged causes of action for negligence, negligence per se, premises liability, and wrongful death.

Joseph and Yolanda filed a motion for summary judgment based primarily on the contention that they owed no duty to Chung Ho Kim under the circumstances. They did not own or keep the dogs, they had no actual knowledge of any dangerous or vicious propensities of the dogs, and they had no actual or constructive knowledge of any dangerous condition on their property. They relied on their own deposition testimony, Raymond's

4

deposition testimony, and the Kims' allegedly factually devoid discovery responses.

In opposition, the Kims argued that Raymond's unleashed dogs constituted a dangerous condition on Joseph and Yolanda's property. They were aware of this condition and had the power to remedy it under the lease agreement, but they did not do so. They also relied on deposition testimony from Raymond, Joseph, and Yolanda, as well as deposition testimony from the animal control officer who cited Raymond for leash and licensing law violations.

After hearing argument, the trial court granted the motion for summary judgment. It found that Joseph and Yolanda "had no prior knowledge that the dogs that approached and barked at Mr. Kim had any vicious or dangerous propensities. They had never received any reports or complaints regarding the dogs aggressively pursuing any pedestrian, act in any inappropriate way or had any concern after watching the dogs interact with non-family members." It rejected the Kims' contention that the presence of unleashed dogs was a dangerous condition on the property: "Plaintiffs have cited no authority for the proposition that Defendants have liability based solely on knowledge that the tenants had dogs which may not be restrained or leashed at all times. Rather, Plaintiffs are attempting to hold Defendants vicariously liable for the alleged negligent acts of the tenants allowing the dogs to be unleashed in the front yard. Courts have consistently found that the negligence of a tenant cannot be imputed to the landlord." The court entered judgment against the Kims, and they appeal.

DISCUSSION

" 'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a

5

matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of the University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) "Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.] A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action." (*Ibid*.)

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)

The elements of a premises liability claim "are the same: a legal duty of care, breach of that duty, and proximate cause resulting in injury. [Citations.] Premises liability ' "is grounded in the possession of the premises and the attendant right to control and manage the premises" '; accordingly, ' "mere possession with its attendant right to control conditions on the premises is a sufficient basis for the imposition of an affirmative duty to act." ' [Citation.] But the duty arising from possession and control of property is adherence to the same standard of care that applies in negligence cases." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 (*Kesner*).)

6

"Duty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if ' "the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' [Citation.] Whether a duty exists is a question of law to be resolved by the court." (*Brown*, *supra*, 11 Cal.5th at p. 213.) Because it is a question of law, duty " 'is particularly amenable to resolution by summary judgment.' " (*Regents*, *supra*, 4 Cal.5th at p. 618.)

"The 'general rule' governing duty is set forth in Civil Code section 1714 (section 1714). [Citation.] First enacted in 1872, section 1714 provides: 'Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .' (*Id.*, subd. (a).) This statute establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.' " (*Brown*, *supra*, 11 Cal.5th at pp. 213-214.)

In *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), the Supreme Court "identified several considerations that, when balanced together, may justify a departure from the fundamental principle embodied in . . . section 1714: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) "[H]owever, in the absence of a statutory provision establishing an exception

7

to . . . section 1714, courts should create one only where 'clearly supported by public policy.' " (*Ibid.*)

These considerations "are evaluated at a relatively broad level of factual generality. Thus, as to foreseeability, [our Supreme Court has] explained that the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' " (*Cabral*, *supra*, 51 Cal.4th at p. 772.) "In applying the other *Rowland* factors, as well, [the Supreme Court has] asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." (*Ibid.*)

The court in *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504 (*Uccello*) examined a landlord's liability under similar, though not identical, circumstances. In that case, a tenant's dog attacked and seriously injured a third party. (*Id.* at p. 508.) The evidence supported the reasonable inference that the landlord knew of the dog's dangerousness. (*Id.* at p. 510.)

*Uccello* began its discussion with the observation that, "[h]istorically, the public policy of this state generally has precluded a landlord's liability for injuries to his tenant or his tenant's invitees from a dangerous condition on the premises which comes into existence after the tenant has taken possession." (*Uccello*, *supra*, 44 Cal.App.3d at p. 510.) "The rationale for this rule has been that property law regards a lease as equivalent to a sale of the land for the term of the lease." (*Id.* at p. 511.) Courts developed a number of exceptions to this general rule, which generally cover situations where "at or

8

after the time possession is given to the tenant the landlord retains or acquires a recognizable degree of control over the dangerous condition with a concomitant right and power to obviate the condition and prevent the injury. In these situations, the law imposes on the landlord a duty to use ordinary care to eliminate the condition with resulting liability for injuries caused by his failure so to act." (*Ibid.*)

Along these lines, *Uccello* found a similar exception where a landlord has knowledge of a dog's dangerous propensities and the ability to prevent harm by removing the dog or terminating the tenancy. "[I]f a landlord has such a degree of control over the premises that it fairly may be concluded that he can obviate the presence of the dangerous animal and he has knowledge thereof, an enlightened public policy requires the imposition of a duty of ordinary care. To permit a landlord in such a situation to sit idly by in the face of the known danger to others must be deemed to be socially and legally unacceptable." (*Uccello*, *supra*, 44 Cal.App.3d at p. 512.)

*Uccello* found support in the *Rowland* factors identified above. (*Uccello*, *supra*, 44 Cal.App.3d at p. 513.) "Assuming [the landlord's] knowledge of the vicious dog, the foreseeability of harm to the [third party] was obvious; it was simply a question of time before someone invited onto the premises would be attacked by the dog. The failure of [the landlord] to order his tenant to cease harboring the dog under pain of having the tenancy terminated, is closely connected with the injuries suffered; if [the tenant] had not removed the dog and [the landlord] had ousted him from possession the danger would have ended. There is a moral blame attached to a landlord's conduct under these circumstances; he cannot be permitted to knowingly stand aside where it is shown that he has the power to remove the animal from the premises without incurring a liability for his failure to act. We find

9

no extensive burden on a landlord in requiring him to act under the circumstances; the risk of the loss of a tenant for his premises must yield to the obvious danger to third parties." (*Id.* at pp. 513-514.)

Despite this conclusion, however, *Uccello* maintained that its holding was limited: "It should be emphasized that a duty of care may not be imposed on a landlord without proof that he knew of the dog and its dangerous propensities. [Citation.] Because the harboring of pets is such an important part of our way of life and because the exclusive possession of rented premises normally is vested in the tenant, we believe that *actual* knowledge and not mere constructive knowledge is required." (*Uccello, supra,* 44 Cal.App.3d at p. 514.) "[O]nly when the landlord has actual knowledge of the animal, coupled with the right to have it removed from the premises, does a duty of care arise." (*Ibid.*)

The rule in *Uccello*, and its limitation, have been followed in numerous cases. (See, e.g., *Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1369-1370 (*Chee*); *Yuzon v. Collins* (2004) 116 Cal.App.4th 149, 163 (*Yuzon*); *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1838; *Lundy v. Cal. Realty* (1985) 170 Cal.App.3d 813, 820.)

One of these cases, *Chee*, comes closer to the circumstances here. An elderly resident of a condominium complex was injured when a tenant's dog ran out into the common area and jumped on the resident, causing her to fall and sustain various injuries. (*Chee, supra,* 143 Cal.App.4th at p. 1364.) The injured resident sued the tenant's landlord for negligence and premises liability. (*Id.* at pp. 1364-1365.)

*Chee* recognized the general principles discussed in *Uccello*: "The general duty of care owed by a landowner in the management of his or her property is attenuated when the premises are let because the landlord is not

10

in possession, and usually lacks the right to control the tenant and the tenant's use of the property. Consequently, it is well established that a landlord does not owe a duty of care to protect a third party from his or her tenant's dog unless the landlord has actual knowledge of the dog's dangerous propensities, and the ability to control or prevent the harm." (*Chee, supra,* 143 Cal.App.4th at p. 1369.) Because the landlord in that case did not have actual knowledge that the dog was dangerous, *Chee* held that the landlord did not owe any duty to the resident. (*Id.* at p. 1370.) Pertinent to this appeal, *Chee* rejected the resident's reliance on evidence that the dog had been seen off-leash and relieving itself in the complex's common areas. (*Id.* at p. 1371.) *Chee* explained, "even if [the landlord] had been aware that the dog was allowed to run off-leash . . . , this evidence did not permit an inference that the dog was dangerous." (*Ibid.*)

The reluctance of the courts to impose liability in the absence of actual knowledge of dangerousness reflects, in part, the presumption that dogs are naturally harmless and companionable to humans. " '[Because] the great majority of dogs are harmless . . . the possession of characteristics dangerous to mankind . . . is properly regarded as abnormal to them.' [Citation.] '[F]rom time immemorial [dogs] have been regarded as the friends and companions of man.' [Citation.] 'A dog's bad character or evil disposition is not presumed. The view expressed in *Mason v. Keeling* . . . [1699, 12 Mod. 332] that "the law takes notice, that a dog is not of a fierce nature, but rather the contrary" is generally adopted. [¶] A dog is presumed to be tame, docile and harmless until the contrary appears. [Citations.] Harming a human being is regarded as contrary to a dog's nature. "He errs *contra naturam suam* [against his nature] by biting or any serious misdoing . . . ." ' " (*Drake v. Dean* (1993) 15 Cal.App.4th 915, 921-922 (*Drake*).)

11

This reluctance also reflects the importance of dogs as companion animals in our society. "Keeping a pet dog is undoubtedly one of the most cherished forms in which the constitutionally protected right to own personal property is exercised. To most people it is more than ownership of mere personal property. More than once courts have recognized that the keeping of such pets 'is such an important part of our way of life' [citation], and have recognized the perhaps sentimental but nonetheless universally strong affection of mankind for the dog." (*Nava v. McMillan* (1981) 123 Cal.App.3d 262, 267 (*Nava*).)

The Kims seek to distinguish the *Uccello* lines of cases. They rely not on a landlord's knowledge of a dog's dangerousness, but on his or her knowledge of a tenant's practice of allowing dogs to roam unleashed on the leased premises. They contend that Joseph and Yolanda had a duty to terminate or refuse to renew the lease agreement if Raymond continued to allow the dogs to roam unleashed.[1]

If *Uccello* applied, the Kims would not be able to prove liability because they have not shown that Joseph and Yolanda knew that the dogs were dangerous. (See *Chee*, *supra*, 143 Cal.App.4th at p. 1371; *Uccello*, *supra*, 44 Cal.App.3d at p. 514 ["It should be emphasized that a duty of care may not be imposed on a landlord without proof that he knew of the dog and its

---

[1] On reply, for the first time, the Kims suggest that Joseph and Yolanda had a duty to install a fence around the front yard once they knew the dogs were being kept there. Our Supreme Court has cautioned that the duty analysis "requires the court in each case (whether trial or appellate) to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 (*Castaneda*).) Because the Kims did not identify this specific action in their opening brief, we will not consider its merits. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 692-693.)

dangerous propensities."].)  But we agree the Kims are alleging a different basis for liability that was not directly considered in *Uccello* or its progeny. We therefore turn to the specific question of duty presented here.

As noted, section 1714 imposes on every person a general duty of reasonable care in the management of his or her property or person.  (*Brown*, *supra*, 11 Cal.5th at pp. 213-214.)  The *Rowland* factors guide courts in determining whether a certain class of conduct should be excluded from this general duty.  (*Id.* at pp. 217-218; *Cabral*, *supra*, 51 Cal.4th at p. 771.)  For reasons we explain, our review of these factors leads to the conclusion that landlords do not have a duty to terminate or refuse to renew the lease of tenants who allow their dogs to roam unleashed on the premises under the tenant's supervision.

"The *Rowland* factors fall into two categories.  The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant.  The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability.  The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Regents*, *supra*, 4 Cal.5th at p. 629.)

" 'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.' [Citations.]  In examining foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the

13

kind of harm experienced that liability may appropriately be imposed . . . ." ' "
(*Regents*, *supra*, 4 Cal.5th at p. 629.)

The foreseeability factor weighs slightly in favor of an exception from the general duty of care where a landlord is aware that his or her tenant allows his dogs to roam unleashed on the leased premises under the tenant's supervision. On one hand, it is reasonably foreseeable that a nondangerous dog could approach (and even come into contact with) a passing stranger if not restrained. (See *Drake*, *supra*, 15 Cal.App.4th at p. 931.) Leash laws are designed to protect the public from the consequences of such occurrences. (*Rollins v. Hedin* (1952) 114 Cal.App.2d 488, 490.) "Whatever may be said about the affection which mankind has for a faithful companion, modern city conditions no longer permit dogs to run at large." (*Brotemarkle v. Snyder* (1950) 99 Cal.App.2d 388, 390.) On the other hand, " '[m]ost dogs are usually considered domestic, companionable, good natured and harmless.' " (*Drake*, at p. 922.) " 'A dog is presumed to be tame, docile and harmless until the contrary appears.' " (*Ibid.*) Off-leash dogs in the company of their owners, or dogs whose leashes are inadequate to prevent them from approaching passersby, are a common sight in contemporary society. Although these dogs may cause annoyance to some, their potential to cause appreciable physical injury is generally regarded as rather low. (See *Chee*, *supra*, 143 Cal.App.4th at p. 1371 [an off-leash dog is not a "dangerous" dog].) The Kims acknowledge that the circumstances of this case, where serious injury did occur, are "unique and tragic." We agree. The relative uniqueness of these

circumstances undermines the idea that the injury here was reasonably foreseeable.[2]

Thus, although reasonable arguments can be made in support of either view, we conclude the foreseeability factor weighs slightly in favor of an exception to the general duty of care. A landlord's failure to terminate the tenancy of a tenant who allows a nondangerous dog to roam unleashed on the leased premises under his supervision should not normally result in appreciable physical injury, let alone serious injury or death, to a person who is walking down a neighboring sidewalk. On balance, for a landlord, the prospect of such an injury is not " ' "likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." ' " (*Kesner*, *supra*, 1 Cal.5th at p. 1145.)

"The second factor, 'the degree of *certainty* that the plaintiff suffered injury' [citation], may come into play when the plaintiff's claim involves intangible harm, such as emotional distress." (*Regents*, *supra*, 4 Cal.5th at p. 630.) The Kims allege physical injury and wrongful death. These injuries are readily identifiable and straightforwardly provable, so this factor weighs against establishing an exception to the general duty of care.

---

[2] The Kims rely on the following language describing the dangers of leaving an animal unrestrained: " 'The practice of leaving animals . . . unfastened upon our public streets, and thus placing in jeopardy the lives of men, women, and children, should not be tolerated. It is in fact, condemned by the law, and when damages result therefrom, the owner of such animal should be held to a strict legal accountability.' " (*Delfino v. Sloan* (1993) 20 Cal.App.4th 1429, 1434, italics omitted.) But this language was written in the context of a runaway horse in late 19th century San Francisco. The horse "had been left hitched to an unsecured buggy" and subsequently "ran down the plaintiff and injured him severely." (*Ibid.*, citing *Siemers v. Eisen* (1880) 54 Cal. 418, 420-421.) The dangers of an unsecured horse and an unsecured nondangerous dog, especially in an urban environment, are not comparable.

"The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.] 'Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable.' " (*Regents*, *supra*, 4 Cal.5th at pp. 630-631.) This factor weighs strongly in favor of an exception to the general duty of care. It is undisputed that Joseph and Yolanda did not own or keep the dogs and they had no knowledge of any dangerous or vicious propensities of the dogs. They did not train or supervise the dogs, and they were not present when the incident occurred. Their failure to terminate the lease agreement contributed only indirectly to the risk of injury. The direct cause of Chung Ho Kim's injury was Raymond's decision to allow the dogs to roam unleashed that evening. Indeed, in their briefing, the Kims argue that "the injuries sustained by a victim as a result of actively avoiding an unleashed dog in a defensive manner is directly related to the negligen[t] act of *a dog owner*, in permitting their dog to roam unleashed in an unenclosed front yard, in an area where it is prohibited by law to do so." (Italics added.) The Kims do not address whether the injury was directly related to the alleged negligent act of the *landlord*, which is the relevant consideration here.

The fourth factor is the *moral blame* attached to the defendant's conduct. (*Regents*, *supra*, 4 Cal.5th at p. 631.) This factor, too, weighs in favor of an exception to the general duty of care. A landlord's failure to terminate the tenancy under the circumstances here is not morally blameworthy. The Kims contend that Joseph and Yolanda ignored "an obvious dangerous condition," but we disagree that the mere presence of

16

unleashed, nondangerous dogs under the supervision of their owner was such a dangerous condition that common morality demanded action.

The fifth factor, the *policy of preventing future harm*, is " 'ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible.  The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.' " (*Regents*, *supra*, 4 Cal.5th at p. 632.)  This factor does not clearly weigh in either direction.  Enforcing a duty of care may, at the margin, prevent some future harm because landlords would be incentivized to terminate the tenancies of tenants who allow their dogs to roam unleashed, and tenants would be incentivized to leash their dogs.  But this effect would be substantially blunted by the undisputed limitation on a landlord's potential liability:  The landlord must have actual knowledge of the unleashed dogs.  Most landlords, unlike Joseph and Yolanda, do not visit their tenants socially.  They are unlikely to have actual knowledge of unleashed dogs.  And, if a tort duty were enforced, tenants would have an incentive to make sure their landlords did not have such knowledge to avoid termination of their tenancy.  Many dogs would likely remain unleashed notwithstanding tort liability for landlords.

The sixth factor considers "the *burden* that recognizing a tort duty would impose on the defendant and the community." (*Regents*, *supra*, 4 Cal.5th at p. 633.)  The burden of enforcing a duty of care under the circumstances here would be substantial.  The landlord does not control a tenant's dogs.  The landlord's remedy against a tenant who does not leash his dogs is to terminate the tenancy.  If the lease is not up for renewal, termination commonly involves eviction.  Eviction proceedings are a large

17

burden to place on a landlord whose only issue is the presence of an unleashed, nondangerous dog. (Cf. *Castaneda, supra*, 41 Cal.4th at p. 1219 [even in the case of a vicious or dangerous tenant, the duty to evict only arises where "the tenant's behavior made violence toward neighbors or others on the premises highly foreseeable"].) Landlords are more likely to forbid the keeping of dogs altogether, which would negatively affect society as a whole. (See *Yuzon, supra*, 116 Cal.App.4th at p. 166; *Nava, supra*, 123 Cal.App.3d at p. 267.)

"The final policy factor in a duty analysis is the *availability of insurance* for the risk involved." (*Regents*, *supra*, 4 Cal.5th at p. 633.) Joseph and Yolanda do not appear to dispute the availability of insurance for the risk here. This factor weighs against recognizing an exception to the general duty of care.

Considering these factors together, an exception to the general duty of care is warranted under the circumstances here. The foreseeability of injury as a result of Raymond's continued tenancy was marginal at best. Unleashed dogs under supervision of their owner are not likely to cause appreciable physical injury, let alone serious injury or death. Joseph and Yolanda did not own or keep the dogs, they had no knowledge of any dangerous or vicious tendencies, and they had no control over the dogs on the night in question. The alleged negligence of Joseph and Yolanda was only distantly and indirectly connected to Chung Ho Kim's injuries. It is not sufficiently likely that their alleged negligence would result " ' "in the kind of harm experienced that liability may appropriately be imposed . . . ." ' " (*Regents*, *supra*, 4 Cal.5th at p. 629.) And, as a policy matter, requiring landlords in their situation to terminate a tenancy to prevent the presence of unleashed, nondangerous dogs would have little benefit and substantial costs. It would

not even advance any moral cause, since the landlords here did not act in a morally blameworthy manner.

As our Supreme Court has explained, " 'duty' is not an immutable fact of nature[.]" (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, & fn. 6.) "A duty exists only if ' "the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' " (*Brown, supra*, 11 Cal.5th at p. 213.) " ' "Courts . . . invoke[] the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act . . . .' " ' " (*Kesner, supra*, 1 Cal.5th at p. 1143.) While we do not lightly establish an exception to the general duty of care, our consideration of the *Rowland* factors shows that such an exception should apply to the category of conduct at issue here. Because duty is an element of each of the Kims' causes of action, they cannot prevail as a matter of law. The trial court did not err by granting the motion for summary judgment.[3]

---

[3] The Kims separately address the existence of a dangerous condition, as a prerequisite to their premises liability cause of action. But such a cause of action still requires a showing that the landlord had a duty to act under the circumstances. (*Kesner, supra*, 1 Cal.5th at p. 1158.) "The existence of the landlord's duty to others to maintain the property in a reasonably safe condition is a question of law for the court." (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 305.) Our discussion of the *Rowland* factors applies equally to the duty element of the Kims' premises liability cause of action. (See *Kesner*, at pp. 1158-1159; *Sturgeon*, at p. 306.) We need not consider separately the existence of a dangerous condition.

19

## DISPOSITION

The judgment is affirmed.  Joseph and Yolanda Vivas are entitled to their costs on appeal.

GUERRERO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

20