Filed 2/9/23  In re J.A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | B314664 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP05558) |
| Plaintiff and Respondent, | |
| v. | |
| C.A., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

C.A. (mother) appeals from a juvenile court's orders denying her Welfare and Institutions Code[1] section 388 petitions to modify. Mother argues that the court abused its discretion by denying her petitions without a hearing. We conclude otherwise, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Detention and petition.

The family consists of mother, father, and six children: J.A. (age 11 as of August 2018), N.M. (age eight), R.M. (age six), F.M. (age five), J.M. (age three), and K.M. (age two) (the children). In August 2018, acting on a child abuse hotline referral alleging a woman had a knife, police found mother, father, and paternal aunt arguing in front of the family's home. The two youngest children were present, but not injured. After the adults gave conflicting versions of events and were observed to have several injuries, mother was arrested on a felony domestic violence charge. With mother incarcerated and father unhoused with

_____

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

unknown whereabouts, maternal aunt[2] was to care for the children.[3]

The children's schools reported attendance issues and problems with the older children's behavior, which mother had not addressed with recommended mental health services for them. The children old enough to make a statement denied that mother and father fought or mistreated them, and several were emotional about being separated from mother, stating they liked living with her.

The Los Angeles County Department of Children and Family Services (DCFS) filed section 300 petitions alleging that mother and father's domestic violence endangered their children. The petitions also alleged that father was a sex offender and registered controlled substance offender, and that mother allowed relatives to possess and abuse marijuana in the children's home and in their presence. At the detention hearing, the court ordered the children detained, and granted mother monitored visits.

## II. Jurisdiction and disposition.

As documented in the September 2018 jurisdiction/disposition report, mother was released from custody and soon tested positive for marijuana. The children remained placed with maternal aunt. Mother admitted arguing with father and paternal aunt, but claimed that paternal aunt had attacked her, she did not have a knife, and her children were in the car

[2] The record also refers to maternal aunt as maternal great aunt. We refer to her as maternal aunt for ease of reference.

[3] The children were the subject of numerous other referrals dating back to 2013, only one of which was substantiated.

with a relative during the altercation.  Mother denied prior physical altercations with father.  She knew father was a sex offender, but claimed he never used drugs in her presence.  Several of the children, too, denied that their family members used drugs or engaged in violent behavior, except F.M. said that mother "whoop[ed]" him when he misbehaved.

At the jurisdiction/disposition hearing, mother pled no contest to the section 300 petitions as amended, and the court sustained the count alleging that mother and father engaged in physical altercations.[4]  The children were declared dependents and removed from parental custody.  Mother's court-ordered case plan included participation in a domestic violence program, individual counseling, a parenting program, and monitored visits.

## III.  Six-month and 12-month review hearings.

In March 2019, DCFS reported that the children continued to reside with maternal aunt, but those old enough to provide a statement wished to return to mother's care.  Some of them were receiving mental health services to address behavioral issues at school.  Mother was employed parttime and consistently attending her courses, but not her individual counseling sessions.  She visited the children, with maternal aunt monitoring, three times per week.  Maternal aunt reported that mother was attentive and affectionate toward the children, helping them with their needs.  At the six-month review hearing, the court

---

[4] The record does not include the minute orders or any section 388 petitions pertaining to R.M.  We therefore agree with DCFS that mother has failed to meet her appellate burden of producing an adequate record on appeal with respect to R.M.  (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575.)

4

continued mother's services and gave DCFS discretion to liberalize mother's visits.

In August 2019, DCFS received a referral claiming that father attended mother's graduation from her domestic violence program and mother threw coffee on him. The caller further alleged that mother was selling methamphetamine and had lied about living with a relative. The caller claimed that mother was unhoused and spent time with a 17-year-old who mother "hooked" on methamphetamine and was "prostituting." Mother denied these allegations, insisting she had no contact with father since the children's detention.

In September 2019, DCFS reported that mother and father had been arrested together in April 2019 and charged with driving with a suspended/revoked license and possession of drug paraphernalia, respectively. Mother failed to appear at her arraignment. Several of the children, who were still residing with maternal aunt, continued to act out in school but were receiving mental health services to address those issues. Mother was still employed and visited the children three times per week, actively engaging with the children and assisting with chores. Four of the children said they wanted to reunify, while the others were too young to provide statements. Mother also completed several of her programs but had not attended therapy since January 2019, despite telling DCFS otherwise. Mother's dishonesty caused maternal aunt to be reluctant to continue to care for the children.

In September 2019, DCFS received information that mother frequently used marijuana and methamphetamine. Mother, who claimed she used marijuana but no other substances, tested positive for marijuana in August and

September 2019.  The court ordered mother to submit to weekly drug tests.

In September and October 2019, mother had six drug tests, testing positive for marijuana five times.  In September 2019, DCFS received another referral reiterating the allegations regarding the 17-year-old.  Mother again denied the allegations. When interviewed, the 17-year-old denied knowing mother and that she was exploited, but acknowledged using methamphetamine and that an unhoused woman named "Marie" bought her a "blunt" and smoked it with her.  She had met Marie when she was 12 years old, and Marie had six children not in her care.  DCFS reported mother went by "Marie," her middle name.

After obtaining the police report from mother's April arrest, DCFS interviewed mother, who denied contact with father prior to or after the incident.  In October 2019, mother was arrested on an outstanding warrant.

Mother was consistently attending therapy sessions and the social worker observed a positive visit with the six children in October 2019.  However, later that month, maternal aunt reported that mother had yelled and cursed at maternal aunt and uncle and spat at maternal aunt in front of the home while the children were inside of it, and the uncle had to carry mother off the property.  Maternal aunt wanted a restraining order.  Mother claimed that the uncle had started the argument and choked her, prompting mother to seek law enforcement intervention.  At the 12-month review hearing in November 2019, the court continued reunification services, ordering that mother's visits remain monitored, but not by maternal aunt or in her home.

## IV. 18-month review; termination of mother's reunification services.

From October 2019 to February 2020, mother attended monthly individual counseling sessions, despite her statement that such sessions were weekly. She had 15 clean drug tests between October 2019 and January 2020. However, she was observed in contact with father, despite insisting otherwise. Then, in November 2019, they were arrested together for shoplifting. They were later convicted and sentenced to 36 months of probation. Despite the arrest and having been witnessed contacting father during a visit so that the children could speak with him, mother denied contact with father, insisting that he had been following her.

In December 2019, N.M. and R.M. reported that mother instructed them to falsely report that maternal aunt was physically disciplining them. Mother advised N.M. to report that one of maternal aunt's adult sons was sexually abusing N.M. The children denied being physically punished or touched inappropriately. R.M. and N.M. reported mother called father during visits, and R.M. said that mother told her not to disclose the conversations. Mother informed N.M. that she was going to call the police and "make damn sure" the children were removed from maternal aunt's care.

During January and February 2020, scheduling visitation was difficult due to conflict between maternal aunt and the DCFS-approved monitor, maternal uncle. During the visits that occurred, the children reportedly acted out and did not listen to mother. The monitor reported that J.M. stated "my auntie told me not to listen to you" when the monitor attempted to direct J.M., while J.M.'s teacher and maternal aunt reported that J.M.

would say "my mom told me not to listen to you" when being directed at maternal aunt's home and school. Maternal aunt gave DCFS notice to remove the children from her home, but then rescinded that notice. After maternal aunt inquired about adopting some of the children but not others, DCFS expressed concern about separating the children. The three oldest children stated they wanted to reunify with mother.

The 18-month hearing was continued many times, first at mother's request for a contested hearing, and then due to the COVID-19 pandemic. In September 2020, mother tested positive for methamphetamine. She was "shocked," as she had "never used methamphetamine"—only marijuana—and suggested she must have had intercourse with someone who used the drug, was exposed to secondhand smoke, hugged someone who used the drug, or that someone put the drug in her beverage.

In November 2020, mother enrolled in a six-month outpatient substance abuse program. She attended all therapy sessions and was making progress. Later that month she again tested positive for methamphetamine. When DCFS informed mother's program, the program indicated that mother had not disclosed the positive test and later denied using methamphetamine to them. Mother's case manager said her methamphetamine levels were unlikely the result of secondhand exposure.

In or about January 2021, mother was arrested for grand theft auto, fraud, and driving with a suspended license. Police recovered various items from the car, including: Sawzall blades, power tools, a cut catalytic converter, a nitrous oxide container, several balloons, saw blade batteries, a substance resembling methamphetamine, a social security card that did not belong to

mother, EBT cards with the children's names on them (among others), credit or debit cards belonging to other people (including father), a notebook containing other people's identifying information, and $4,622 in cash.

From November 2020 to February 2021, mother had weekly negative drug tests for her treatment program. Mother continued to attend and participate in scheduled sessions, complete assignments, and attend three weekly NA/AA meetings. During dozens of visits with the children over that period, mother engaged positively, although J.M. continued to act out and insist he did not have to listen to mother. As of February 2021, the children wanted to reunify.

Meanwhile, DCFS was becoming concerned about the children's placement with maternal aunt, given her refusals to make the children available for visits, her requests to remove the children, and her calling one of the children an "asshole." The children reported that she physically disciplined them, and she was seen hitting J.M. with a shoe during a Zoom call.

At a February 2021 court appearance, mother provided proof of drug programming compliance, which also showed that her drug tests had been negative during the program's course. However, the court found that mother's progress was insufficiently substantial and that returning the children to her would create a substantial risk of detriment to them. Mother's reunification services were terminated and a section 366.26 hearing scheduled.

## V. Children's removal from maternal aunt's home.

In April 2021, DCFS placed the children with Raquel L.[5] after N.M. ran away from home, and maternal aunt reported the children continued to act out after visits with mother. Raquel L. reported that the children were adjusting positively to her home. However, mother continued to violate DCFS's rules. Among other things, mother asked Raquel L. if she could spend the night in her home, instructed N.M. to walk away from the monitor during a phone call, and asked to take the children shopping unmonitored.

Later that month, the court authorized placement with Raquel L. or another DCFS-approved home, ordered that mother's monitored visits not occur in children's placement, and limited contact between the children and maternal aunt.

In May 2021, the children's therapists reported mother's visits negatively impacted all but the youngest child. Mother did not follow instructions not to argue with caregivers or to discuss the case with the children. The therapists suspected mother was giving the children false information about the case and instructing them to lie. The therapists believed mother effectively "split" the children between mother and caregivers, which adversely affected the children's mental health and escalated their defiant behavior in the days and hours following visits with mother.

In April and May 2021, R.M., F.M., and J.M. were removed from Raquel L.'s home and placed at a transitional shelter after they engaged in destructive behavior, including throwing rocks at

---

[5] Some reports indicate Raquel L. was a "relative," while others state she was a nonrelative extended family member.

neighbors' cars. They initially did well at the shelter, but after speaking with mother on the telephone, they began fighting, stopped following the rules, and engaged in further destructive behavior. Staff was able to calm F.M. and J.M., but had to place R.M. on a one-day psychiatric hold. The three children were then placed with nonrelative extended family member Daisy D., who indicated that the children's negative behavior escalated during mother's visits.

J.A., N.M., and K.M. remained with Raquel L. However, after Raquel L. reported in May 2021 that J.A. did not listen to her and that Raquel L. was stressed, DCFS placed K.M. with Daisy D. and placed J.A. and N.M. in two separate foster homes. N.M. ran away within three hours and was located the next morning. DCFS noted that the children's behavior had improved recently, which DCFS believed was due to less frequent visits with mother.

Due to the uncertainty of the children's placements, DCFS requested a continuance of the section 366.26 hearing. Later that month, the court granted that request and reduced mother's visits to one visit per week. The court admonished the parents not to discuss the case with the children outside of a therapeutic setting.

## VI.   Mother's section 388 petitions.

In May 2021, mother filed five identical section 388 petitions (one for each child, except, as discussed above, there is no petition for R.M. in the record). The petitions requested that the court change its February 2021 orders terminating reunification services and requiring that mother's visits with the children be monitored. Mother asserted her circumstances had changed because she had reenrolled and participated in a

11

parenting class, recently completed a six-month outpatient drug treatment program, attended AA/NA meetings regularly, and regularly participated in individual counseling. She further asserted that such a modification was in the children's best interest because she maintained a deep bond with them, through weekly visits and almost daily telephone contact, and given the lack of a permanent plan for the children, reunification services would facilitate the children's return home and afford them the most stability. In a declaration, mother stated that she had learned from her prior mistakes, including her drug use and criminal conduct, and had grown into a better person. She acknowledged drug use and contact with father during reunification, but claimed that she had recently made progress in her programs, had ceased contact with father, was employed, and was not on parole or probation. Mother's petitions attached proof of attendance at AA/NA meetings, completion of an outpatient drug program, enrollment and participation in a parenting program, and participation in individual therapy and other mental health services since 2019.[6]

In July 2021, the court increased mother's monitored visitation to twice per week. The court summarily denied mother's section 388 petitions.

---

[6] Mother also attached a Form JV-180 proposed order indicating a June 18, 2021 hearing date for the section 388 petition, which was the day of the section 366.26 hearing that took place three days before the petitions were filed. Despite mother's suggestion in her brief that the court "ordered a hearing on whether the court should grant or deny an evidentiary hearing," the form was not signed or dated by a judicial officer.

Later that month, DCFS reported that Raquel L.'s sister, nonrelative Brenda L., had initially expressed a willingness to care for N.M., but changed her mind after experiencing problems with N.M., mother, and maternal grandmother. Brenda L. and Raquel L. reported that N.M. was abusive and disrespectful, and that mother had given N.M. a telephone and $130. As a result, Brenda L. did not know how much unmonitored contact mother and N.M. were having.

At a June 2021 visit, mother reportedly had difficulty managing F.M. and J.M.'s behavior, and the boys fought when mother gave one or the other more attention. The boys would not follow her direction, and N.M. became argumentative. J.M. tried to hit N.M., and N.M. cursed and taunted him. Mother and the monitor tried to intervene, but N.M. would not listen to them. N.M. screamed at mother, complained about not being able to have maternal aunt and grandmother at her placement, and ran away. Mother responded by complaining to the monitor that the caregivers were only caring for N.M. for the money. When N.M. returned, she was talking on the phone to someone she referred to as "aunt." N.M. became upset at J.A. when he took the phone, and had to be calmed down.

After N.M. hung up the phone, she continued to cause her siblings to misbehave and mother struggled to manage them. The monitor suggested that N.M.'s future visits be separate from her siblings. Assessing the situation, DCFS noted mother's pattern of manipulating her children into making false allegations and acting out when she had unmonitored access to them. It was concerned about N.M.'s behavior and her mental health.

On August 2, 2021, mother refiled the same section 388 petitions she previously filed in June 2021. On August 5, 2021, the court summarily denied the petitions, reasoning that mother failed to make a prima facie showing of changed circumstances or that the requested modification would promote the children's best interest.[7] Mother timely appealed from the August 5, 2021 order.

## DISCUSSION

Mother contends the juvenile court abused its discretion by summarily denying her August 2021 section 388 petitions and denying her request to reinstate reunification services.[8] We disagree.

### A. Governing law and standard of review.

Section 388 permits a parent to petition the juvenile court to modify any of its orders based on changed circumstances or new evidence. To obtain the requested modification, the moving party must demonstrate by a preponderance of the evidence both a change of circumstance and that the proposed change of court order is in the child's best interest. (*In re Mickel O.* (2011) 197

---

[7] An August 23, 2021 status report reflects statements from five of the children as to where they wanted to live: "I want to live with . . . maternal aunt. I see her as my mother."; "I want to be with them (siblings)."; "I like it here (caregiver [Daisy D.]). I'm happy here."; "Happy here with Daisy."; "I want to stay here (caregiver Daisy [D.])." The precise dates of these statements and whether they were available to the juvenile court at the time of its August 5, 2021 order are unclear from the record.

[8] Mother advances no challenge to the court's adjudication of the portion of her section 388 petitions requesting unmonitored visits.

Cal.App.4th 586, 615 (*Mickel O.*).)

To obtain a hearing on a section 388 petition, the moving party must make a prima facie showing of both elements. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1504–1505.) The petition must be liberally construed in favor of granting a hearing, and the prima facie requirement is met if the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. (*Ibid.*) "If it appears that the best interests of the child or the nonminor dependent may be promoted by the proposed change of order . . . the court shall order that a hearing be held." (§ 388, subd. (d).)

The change in circumstance must be such that the problem that brought the child into the dependency system has been removed or ameliorated; the change must therefore be significant or substantial. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) Circumstances must have changed and not be merely changing. (*Mickel O., supra,* 197 Cal.App.4th at p. 615.) To determine whether this showing has been made, the court may consider the entire factual and procedural history of the case. (*Id.* at p. 616.)

Whether to modify an order under section 388 rests in the juvenile court's discretion and will not be disturbed on appeal unless there has been a clear abuse of discretion. (*Mickel O., supra,* 197 Cal.App.4th at p. 616.)

**B.    The juvenile court did not abuse its discretion in summarily denying mother's August 2021 section 388 petitions.**

Mother principally contends that she made a prima facie showing that there were changed circumstances and that additional reunification services were in the best interest of the children, and thus the juvenile court abused its discretion in

denying her an evidentiary hearing on her section 388 petitions. Mother is mistaken.

First, the juvenile court's conclusion that mother had not demonstrated a substantial change in circumstances warranting reinstatement of reunification services was well within its discretion. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

The children were declared dependents due to their exposure to domestic violence and father's status as a sex offender and substance abuser. To address these issues, the court approved a case plan that included domestic violence and parenting classes, individual counseling, and monitored visits. Initially, mother was partially compliant with her case plan, attending and positively engaging in her visits and participating in some (but not all) of her required programming. Soon, however, mother engaged in troubling behaviors that threatened the children's placements and significantly called into question the effectiveness of any programming.

Significantly, mother was arrested several times throughout the dependency proceedings, including in April 2019, when mother was arrested with father with drug paraphernalia found in the vehicle, in October 2019, for failing to appear for her arraignment for her April 2019 arrest, in November 2019, for shoplifting with father, and finally in 2021, for stealing a car and for credit card fraud. Mother also allegedly engaged in a violent altercation with father at her graduation from her domestic violence program. Further, in spite of her participating in drug rehabilitation and AA/NA, mother possessed, sold, and/or used various controlled substances as recently as 2021, just a few months before she filed her section 388 petitions and well after she had started the programming which formed the basis for her

petitions.  And, even after mother began to regularly attend therapy, she engaged in another violent altercation with family members in front of her children.

Further, despite mother's participation in parenting programs, mother repeatedly made decisions that had materially adverse effects on the children's placements, with reports that the children were acting out against their caregivers and teachers at mother's encouragement, causing their caregivers to have doubts about, or bow out of, their responsibilities.  Although mother had difficulties responding to situations where the children acted out dating back to early in the proceedings, these occurrences only multiplied as the proceedings dragged on.  After a few troubling events occurred in which the children committed destructive and defiant acts after visiting with mother, it became clear that their interactions with mother had a direct, adverse effect on their behavior, and the court had to reduce mother's visitation in the days before mother filed her first section 388 petitions.  These difficulties continued at subsequent visits while mother's first section 388 petitions were pending, with mother unable to redirect the children's fighting over a telephone that mother had given one of the children (which had enabled unmonitored contact with relatives).  Relatedly, the record is replete with examples—well over a dozen occurring both before and during the pendency of her section 388 petitions—of mother's disregarding court orders and/or being dishonest with various authorities, frequently roping her children into her misdeeds and even causing them to mimic her deceptive behavior.[9]

---

[9] We also note that mother was serving a term of 36 months' probation when at least some of these events occurred, although

17

Mother emphasizes the evidence in her section 388 petitions that she was employed, had completed a parenting class and drug treatment program, attended AA/NA meetings and biweekly therapy sessions, and maintained sobriety and regular visits with her children. But while mother completed some additional coursework and regularly visited with the children, mother's behavior, as described above, called into doubt whether she derived any benefit from these programs. Indeed, as we have described, even after completing various elements of her case plan, mother continued to engage in illegal behavior and disrupt the children's placements. (See *In re N.F.* (2021) 68 Cal.App.5th 112, 121 [where parent's issues have "repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program"].) As such, the court did not abuse its discretion in determining that any change in circumstances was not sufficiently substantial to warrant reinstatement of services. (*Mickel O.*, *supra*, 197 Cal.App.4th at pp. 615–616.)

But even were that not the case, we nonetheless discern no clear abuse as to the second prong of the analysis—whether the proposed modification—namely, reinstatement of reunification services—was in the children's best interest.

Mother continued to fight with relatives in the presence of the children and to involve herself in serious criminal conduct. Further, mother persistently refused to follow instructions not to argue with caregivers or to discuss the case with the children,

it appears, based upon mother's declaration appended to her petitions, that her probation might have been terminated early.

18

instead giving the children false information about the case and instructing them to lie.  As a result, the children's therapists concluded that interactions with mother were adversely affecting her children's mental health and escalating their defiant behavior.  In short, the record amply supported the juvenile court's conclusion that permitting mother additional contact with the children and further reunification services were not in their best interests.

Mother's citation to *In re Aljamie D.* (2000) 84 Cal.App.4th 424 (*Aljamie D.*) does not compel a different conclusion.  In *Aljamie D.*, dependency proceedings were instituted based solely on mother's drug abuse, and mother was ordered to participate in rehabilitation and parenting classes, with monitored visitation.  (84 Cal.App.4th at p. 427.)  Approximately three years later, mother alleged in a section 388 petition that she had completed "numerous educational programs and parenting classes, and had tested clean in weekly random drug tests for over two years.  She had visited consistently with the children and continued to have a strongly bonded relationship with them."  (84 Cal.App.4th at p. 432; see *id.* at pp. 426–428.)  Because mother had substantially complied with her case plan, including no positive drug tests, the Court of Appeal concluded, as DCFS conceded, that mother had demonstrated changed circumstances.  (*Id.* at p. 432.)  Here, DCFS has made no such concession, instead correctly highlighting that mother's periods of adherence to her case plan were hardly unblemished, and that her more recent periods of progress occurred over a much shorter period than was at issue in *Aljamie D.*  (See, e.g., *In re N.F.*, *supra*, 68 Cal.App.5th at p. 121 [relatively brief period of sobriety insufficient].)

19

As to the best interest question, mother posits that *Aljamie D.*, *supra*, 84 Cal.App.4th at page 432, supports the proposition that a parent's consistent visitation and a bonded relationship with the children suffices to demonstrate that modification is in those children's best interest.  Preliminarily, we note that the best interest analysis in *Aljamie D.* focused not on these elements, but instead on the fact that the child had testified in the subsequent section 366.26 hearing that she wanted to reunify with mother.  (*Aljamie D.*, at pp. 430–432.)  This too, varies from the record in the case before us, where evidence submitted shortly after the section 388 orders suggested that the children wanted to remain with caregivers, and not reunify with mother.  Finally, unlike in the present case, there was no suggestion in *Aljamie D.* that the child's contact with mother had adverse mental health effects or threatened her school performance or foster care placement.

For these reasons, the juvenile court did not abuse its discretion in denying mother's August 2021 section 388 petitions without a hearing.  (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.)

## DISPOSITION

The August 5, 2021 orders denying mother's section 388 petitions are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.